## The People on the Relation of the St. Mary's Falls Ship Canal Company v. The Auditor General.

The act of the Legislature of Michigan of February 12th, 1853, authorizing the commissioners for the construction of the St. Mary's Falls Ship Canal to stipulate on behalf of the state, in the contract for such construction, that any taxes to be assessed on the lands donated for that purpose should be remitted to the contractors for a period of five years, except as to any portion of such lands sooner sold; and the contracts made by the commissioners, in pursuance of such act, are constitutional and valid.

Whether the contractors, by making an agreement of sale for a parcel of the lands, receiving a payment down, and giving the usual contract in such cases for a conveyance on the remainder being paid, thereby *sell* such parcel within the meaning of said act—*quære.*

*Heard June 7th and 8th.    Decided July 15th.*

Petition for a mandamus.

The petition sets up:

That, by an act of the Legislature of the state of New York, of April 12th, 1853, the relators were incorporated, and authorized to construct the St. Mary's Falls Ship Canal, in pursuance of the laws of Congress and of Michigan in that behalf: That, by the act of the Legislature of Michigan of February 5th, 1853, the grant of lands by the national government for the construction of said canal was accepted, and the appointment of commissioners to contract for its construction provided for: That, by a supplementary act of February 12th, 1853, the said commissioners were authorized, in the agreement for such construction, to stipulate with the contractors for the remission of taxes on said lands, for a period not exceeding five years from the time fixed for the completion of the canal; provided, however, that, when any of said lands should be sold by the contractor to any other persons, the same should thereafter be subject to such taxation as in other cases: That said commissioners did, in pursuance of said acts, enter into a contract with Erastus Corning and his associates, stipulating therein for the remission of taxes on said lands for the said period of five years; which contract was

assigned by the contractors to the relators, who constructed the canal in pursuance thereof, and the same was accepted by the state, and the said lands conveyed to the relators in accordance with the terms of the contract:

That, on January 1st, 1857, the relators contracted with one Kerswell to sell him certain of said lands, upon the terms of the payment of one-fourth of the purchase price down, and the remainder in three annual instalments, which still remain unpaid; and gave him the usual executory contract of sale, by which they undertook to convey to him when payment was made in full: And that like contracts exist, the terms of which are unperformed, for the sale of about ten thousand acres of the said lands, the title to all of which still remains in the relators:

That relators have furnished the Auditor General with a list of all the lands sold by them, with the date of sale, and name of the grantee, together with a list of all the lands so contracted to be sold:

That all of the unsold lands, as well those contracted for as those not under contract, have been taxed for the year 1857, and returned to the office of the Auditor General:

That they have applied to the Auditor General to remit and receipt such taxes in accordance with said contract, but that he refuses to do so.

And they pray for a writ of mandamus, directed to the said Auditor General, commanding him to receipt all the taxes assessed for 1857, upon all said two classes of unsold lands.

An alternative writ having issued upon this petition, the Auditor General appeared, and filed his answer, admitting substantially the facts set up in the petition, and justifying his refusal to remit the taxes on the grounds, *first*, that the lands *contracted* have been *sold* within the meaning of said supplementary act, and are therefore subject to taxation; and, *second*, that the whole provision for the remission of the taxes is unconstitutional and void.

*G. V. N. Lothrop*, and *J. F. Joy*, for relators.

*J. M. Howard, Attorney General*, for the respondent.

The remission of the taxes assessed upon these lands is a violation of the eleventh section of Article XIV of the Constitution, which declares that "the legislature shall provide an uniform rule of taxation, except on property paying specific taxes; and taxes shall be levied on such property as shall be prescribed by law."

The remission of the taxes to the canal company in the manner provided by section two of the amendatory act, will have the effect:

*First:* To impose upon all the property of the state subject to the payment of the state tax, that part of the state tax which was thus imposed upon the privileged lands:

*Second:* To impose upon all the other land and personal property in the county, that portion of the county tax which, by the assessment, fell upon these lands.

In short, the other property in the state is charged annually with the taxes levied on these lands.

It can not be said that this mode or rule of levying taxes is uniform. It is the reverse of uniform. It is allowing the Legislature to relieve one portion of the state entirely from taxation, and to impose the *whole* of the public burdens upon a part, however small that part may be. By section twelve of the same article, all property which is not, by section eleven, exempted from *assessment* by law is to be assessed at *its cash value;* and by section eleven the Legislature is required to impose a tax upon it according to a uniform rule; that is, a rule which shall make each man's property contribute ratably, in proportion to its cash value, to the public burdens. If this be not the meaning of *uniformity* in the rule of taxation, then it has no practical meaning. Assuredly, it does not admit of the idea of *inequality*.

The taxation referred to in section eleven of Article XIV

plainly means the ordinary annual tax, imposed by the Legislature for the purpose of carrying on the government, paying the interest on the public debt, and upon the educational funds in the hands of the state, and defraying the expenses of the counties, as required by section one; and does not include taxation for opening ₜor improving streets in cities and villages, or other similar taxes authorized to be levied for mere local objects.— 8 *Metc.* 191, 187.

These taxes are imposed under the "equalization" required by section thirteen of the same article, and by the act of 1851, page 143, the valuations of the property in the several counties, as equalized and fixed by the Board of Equalization, are made "the basis for apportioning all state taxes until another equalization shall be made."—(*Comp. L.* § 226.) That it was not intended to embrace such mere local and temporary taxes, is made more plain by the residue of the same section, "*except on property paying specific taxes;* and taxes shall be levied on such property as shall be prescribed by law.*"* This language implies that the Legislature may still impose *specific taxes* without reference to the value of the property, and may *exempt* property entirely from taxation. These are ordinary powers of government, which are still treated as without limitation or restriction; and the reference to them shows that it was the intention of the framers to restrict the power of taxation in regard to property which is not the subject of those powers, and that the restriction was that the taxation shall be uniform.

These lands are not, by the terms of the R. S. of 1846 (p. 102), or by the act of February 14, 1853, "expressly," or at all exempted from taxation; the amendatory act of 1853 requires them to be *assessed*, like other lands in the county, and charges the amount over to the rest of the state.

That this is contrary to the intention of the Constitution, is quite clear. The Legislature can not do that which they are required to avoid; they can not establish a rule of taxa-

tion which is not uniform, while they are under an obligation to provide one which is.—*Portland Bank v. Apthorp,* 12 *Mass.* 254; *City of Boston v. Shaw,* 1 *Metc.* 130, 137; *Goddard's Case,* 16 *Pick.* 504; *City of Lowell v. Hadley,* 8 *Metc.* 180; *Cumming v. Police Jury of Rapides,* 9 *La. An. Rep.* 503; *Crow v. State,* 14 *Miss.* 237.

2. The lands contracted are *sold* within the meaning of the act.

MARTIN Ch. J.:

Two questions are presented for our consideration. 1st, whether the provisions of the act of the Legislature supplementary to an act to provide for the construction of a ship canal around the falls of St. Mary's, providing for the remission of taxes to the contractors is constitutional; and 2d, if such be the case, whether the contract of the contractors with John Kerswell for the sale of a portion of their lands, is a *sale* within the purview of such act.

Upon the first question we are agreed that the provision of the act referred to, so far as it authorizes the contract for the remission of the taxes, is constitutional. The Congress of the United States by an act approved August 26th, 1852, (10 *U. S. Stats. at Large,* 35) entitled "An act granting to the state of Michigan the right of way, and a donation of public lands, for the construction of a Ship Canal around the Falls of St. Mary's, in said State," granted to the state the right to construct said canal upon its lands, and also 750,000 acres of land for the purpose of aiding the state in constructing and completing the same. The act provided that the land so granted should be applied to no other use, and that if the canal should not be commenced within three and completed within ten years, the proceeds of the sales of such lands should be paid by this state to the United States, and that accounts should be kept and rendered annually of costs, expense, &c., and until the state is fully reimbursed it may charge a toll for the use of

said · canal, and afterward, only enough to keep it in repair, &c. By an act of the Legislature of this state, approved February 5th, 1853, the necessary provisions were made for securing the grant, and for -the construction of the canal, and the Governor was authorized, by and with the advice and consent of the Senate, to appoint commissioners and an engineer, who were to have the entire and absolute control and supervision of the construction of the canal; and the commissioners were authorized and empowered to make all necessary contracts for the construction of the same, &c. This act contemplated that the contractors for such construction should receive the lands donated in payment (sec. 6), and this was evidently the basis upon which the act was framed. By a supplementary act approved February 12th, 1853, the commissioners were authorized, in case they should find it impracticable to let the contract for the construction of said canal on terms which would secure its completion according to the provisions of the original act, in their discretion to contract that any taxes to be assessed on the lands donated for that purpose, should be remitted for a period not exceeding five years, &c., to the person or persons taking such contract: " *Provided* that whenever any such lands shall be sold by the contractors to any other persons, the same shall thereafter be subject to taxation as in other cases."

It is evident from a consideration of these acts that the land was never a part of the public domain of Michigan, either by grant from Congress, or by sale to a purchaser, before the passage of the act in question, so that the right of taxation had accrued to the state. It was granted to the state for the specific purpose of being applied, either by sale or appropriation, to the purposes of the construction of the canal. As such, it assumed the character of a fund, to be expended under the direction of the state; and so the Legislature evidently regarded it, and that the state held such land only as trustee for the accomplishment of that purpose.

7 MICH—G.

Instead of selling the lands, and appropriating the avails towards the construction of the canal, the Legislature found it desirable, if not necessary, to appropriate the lands themselves. From the course of legislation we may presume that this appropriation of the lands, was found to be insufficient of itself to induce any one to undertake the work, and that in order to render it sufficient, the state authorized the contract for the remission of the taxes thereon. This authority was given, and the contract executed, while the lands were in a condition in which they could not be taxed, and until such right of taxation had accrued to the state, it was not within the scope of either its constitutional or legislative provisions. The state had power to contract with the company to convey the lands after five years, and thus relieve them during that period from taxes, and if it might do this, it is difficult to find a reason why it might not so convey them as to secure the same exemption from taxation. In making this contract the state acted as the trustee of the General Government; in the law authorizing the contract, it was dealing with the subject of the trust, over which no right of taxation then existed. But were this otherwise, I do not regard this remission of the taxes as a violation of that provision of Article XIV of the Constitution which requires the Legislature to provide an uniform rule of taxation, except on property paying specific taxes. This provision of the Constitution has no reference to the power to exempt, or to remit taxes; which is, and necessarily must be, to a great extent, left to the discretion of the Legislature. Its design was to secure, to every portion of the state, and to every class of property taxed, a uniform rate—to secure equality, so that property in one quarter should not be taxed at a higher rate than in another, or the same kind taxed unequally. The Legislature has the power of prescribing the subjects of taxation, and of exemption, but it can not arbitrarily tax property according to locality, kind, or quality, without regard to value (*Sedg. on Stat.* 557), but

in this respect it must act by uniform rules. But to exempt property, as is done in the case of church, school, or library property, or to remit taxes for any cause, has nothing to do with the uniformity of the rule of taxation.

But the objection that the act violates this provision of the Constitution, has reference more especially, if not altogether, to the portion of the act directing the disposition and appropriation of the remitted taxes by the Auditor General, and not to that authorizing the contract of remission. Now the one may be constitutional and the other not, and if the right to make the contract with the company be established, the subsequent provisions of the act by which the amount of such remitted taxes are to be charged to the general fund, whether constitutional or unconstitutional, can have no influence or effect in determining the constitutionality of the law authorizing the remission of the taxes, or the validity of the contract made under it. The company has no concern with the legislation of the state with respect to such taxes after they are remitted—nor can the state refuse to execute its legal contracts because of unconstitutional legislation respecting the subject of the contract, when the contract itself is not involved. Now the contract between the state and the canal company had no reference to the disposition of the remitted taxes. That subject concerns the state alone, and does not affect the contract, nor its validity, in any degree; and whether the second section be or be not unconstitutional we are not required to determine, except so far as it was thought to involve the contract.

But, secondly: Was the land contracted' to Kerswell *sold* within the purview of the act?

The contract between the state and the contractors contained the following provision: "And the parties of the second part (the People of the state of Michigan), further covenant and agree, that all taxes assessed upon any lands to be located as aforesaid, within five years after the time

herein fixed for the completion of said canal, shall be re-
mitted to the parties of the first part," &c. "*Provided*, That
when any of said lands shall be sold by said contractors,
the lands so sold shall be subject to taxation; and the taxes
assessed on lands so sold shall not be remitted."

The acts of the legislature respecting this subject were
also attached and made a part of the contract.

Now, what was the object intended to be secured by the
Legislature, and that intended to be secured by the con-
tractors?

That of the Legislature was the construction of the canal:
That of the contractors, to secure the value of their services;
and—as the land alone was not considered adequate—to secure
those exemptions from burthens respecting it, which would
not only enhance its value in their hands, but protect them
from such burthens until it could be sold, or ample op-
portunity for sale afforded them.

Under the act and the contract, the contractors were
entitled to claim this remission of taxes for five years,
unless the lands were sooner sold. But it is contended
that a *contract* for a sale is a *sale* within the meaning of this
act and contract. This is to ignore all distinctions between
executory and executed contracts. A sale is a transmuta-
tion of property; but so long as the property is only agreed
to be transmuted, upon the performance of the promise to
pay, there is no sale, but only a contract for one. Now
the object which the contractors sought to secure was
the protection of their title from the burthen of taxation,
and the risk of forfeiture for non-payment of taxes. To
hold that upon a contract to sell, when the title was with-
held until payment of the purchase money, the right of
taxation accrues against the land, debars the contractors of
a right which every citizen possesses, unless such right
be asserted at the expense of the exemption before se-
cured to them. Every citizen has a right to contract his
land in this manner, but he remains liable for taxes, and

must suffer the loss of forfeiture and sale. It is true, he may contract that the party taking the contract shall pay the taxes, but this is a personal contract, which he may be enabled to enforce or not, according to the ability of the other party. But with this the state has no concern, and proceeds against his title if a forfeiture and sale occurs. So in the present case, if the land contracted to be sold to Kerswell should be taxed, and he should neglect to pay such tax, unless it be remitted the state in its forfeiture and sale would indirectly proceed against the contractors. They must pay the tax or lose the land. They have a remedy now upon Kerswell, it is true, but this may be worthless, or not, according to his circumstances. Had the Legislature intended to embrace within the act lands contracted, as well as those sold, it was easy to have done it. They having neglected it, we are not to engraft such a provision upon the contract. If we hold that the act contemplates that, in order to entitle the contractors to this exemption or privilege, they shall still hold the land as owners, with the same title and right of disposition and possession originally granted by the state, we shall be engrafting restrictions upon their title altogether inconsistent with absolute ownership. They must hold the lands as owners of other lands may hold theirs; and the act contemplated nothing further.

The argument *ab inconvenienti* urged in behalf of the state is of no value. There is no right which may not be abused. The Legislature had power to throw around this privilege such qualifications and protections as were deemed proper. The language of the act, in any event, must receive a construction consistent with the ordinary import of the words employed, unless a different one is obviously contemplated. Now, as has already been observed, the word *sale* has a fixed legal signification, viz: the transmutation of property from one person to another, for a consideration—and this is also its primary and ordinary meaning.

If all words shall be construed and understood accord-

ing to the common and approved usage of the language, or even, if technical words shall be construed and understood according to the peculiar and appropriate meaning they may have acquired (*see Comp. L.* §2.) then we must construe the word *sold*, as of broader signification than *contracted to be sold*. It is true that the distinction between a sale, and a contract of sale, is not always observed in familiar conversation; yet in all legal and formal instruments it is otherwise; or, if not, the context explains its meaning. Thus our statutes in providing for the sale of the University, school, and other public lands, provide for contracts for sale, under which but a portion of the consideration is paid down, the deed to be executed upon the payment of the full purchase price; and a certificate to that effect is given, called a certificate of sale; and the purchaser is let into possession. Such transaction is called a sale, yet no one can read the statute and the certificate, without understanding that the contract is executory, and no actual transmutation of property has occurred. The title, which upon an executed sale must pass from the vendor to the vendee, remains in the state, and must so remain until the consideration be paid; there is, until such occurrence, only a promise for a promise.

But whether the transaction between the state and the purchaser in such cases be called a sale or not, it is evident that the incidents of a sale do not accompany it. The right of disposition of the land is not in the vendee, nor can it be taxed as his property, nor held subject to his debts, nor for his taxes. This the Legislature well understood, and, consequently, in all the acts providing for the sale of the public lands, provision is made that the land may be taxed, and the holder of the certificate shall be liable for such tax; and this becomes a part of the contract. Without such law, the taxation of the land would be a taxation against the state, precisely as it is in case of contracts of sale by individuals; and the state

provides for its revenue from the lands, precisely as individuals protect themselves from liability for taxes upon contracted lands. Without the statute in the one case, and the contract in the other, no liability for taxes exists in the purchaser before he acquires a title.

That the state, however, in case of its contracts, does not regard the transaction as a sale, or anything more than a contract, is evident from the fact that the statute provides for the assessment and taxation of the vendee's interest as *personal property* — a provision wholly inconsistent with the idea of a sale of real property — and provides for a forfeiture of the contract and the land to the state in case of non-payment, instead of a sale at public auction, as in cases of tax sales generally — (*See Comp. L·* §§ 792, 936, 939). In providing for the assessment of the lands as personal property, the language is as follows: "Any person holding a certificate of purchase of University or primary school lands, shall be liable to be assessed therefor, as *if he were the actual owner thereof*," &c. — language clearly indicating that it was never contemplated that the ownership was elsewhere than in the state.

Nothing, therefore, can be inferred against the relators, from the fact that the word "sold" is used by our statutes, in these instances, to indicate merely an executory contract for sale; nor should any inference be deduced which will manifestly defeat the intent of the contracting parties. Now the evident intention of the state and of its commissioners, in the making of these acts, and of this contract for the construction of the canal, was to place the lands which were to be paid as the consideration for the contract, and the price of the work, in such a position as to exempt the company from all liability to taxation, on account of its lands, and the land from all imposition of taxes, for the period mentioned in the act, if the title should remain so long in the contractors; and this was equally the intention and understanding of the

contractors. If the tax assessed against the lands contracted to Kerswell would be a lien upon such lands, as it most certainly would be, then the company will be exposed to all the dangers and liabilities from which the law and the contract were designed to exempt it. It is true that the company has the personal liability of Kerswell for its protection, and the installment of the purchase money paid out of which to reimburse itself, if compelled to pay the tax; but this protection does not change the nature of the transaction between the parties, nor affect the contract between the company and the state. We must construe the statute and the contract under it without reference to any such facts; otherwise its construction might be made to depend upon the solvency or insolvency of a purchaser, or the amount of the contract price paid down.

I think, therefore, the lands were not "sold" to Kerswell by the relators, so as to authorize their taxation; and that the motion should be granted.

Manning J.:

By the supplementary act, the commissioners were authorized, in their discretion, to contract for the remission of the taxes for a period not exceeding five years, "provided that when any of the land should be sold by the contractors to any other person, they should, thereafter, be subject to taxation as in other cases." This act, it is insisted, is unconstitutional, and that the state, therefore, is not bound by the contract of the commissioners remitting the taxes.

There is nothing in the Constitution in express terms inhibiting the enactment of the law by the Legislature. It is supposed, however, to be an infraction of section 11, article xiv, of the constitution, which is as follows: "The Legislature shall provide a uniform rule of taxation, except on property paying specific taxes; and taxes shall be levied on all such property as shall be prescribed by law." By the next section, "All assessments hereafter authorized, shall

be on property at its cash value." The two sections taken together mean that all descriptions of property subject to taxation, shall pay such proportion of a tax, as their cash value bears to the aggregate cash value of the whole property subject to the tax. An act, therefore, imposing a tax on real estate of five mills on the dollar, and on personal property a greater or less sum, say three or seven mills, for state purposes, would be unconstitutional. So an act imposing a state tax on one part of the state of two mills, and on the other part of the state of one mill, would be unconstitutional.

It is supposed the remission of the taxes in question falls within this principle. Such would undoubtedly be the case, if the Constitution subjected all kinds and descriptions of property to taxation, and it was not in the power of the Legislature to designate the property to be taxed. The lands of the relators are subject to taxation; they are regularly assessed, and a tax is levied on them from year to year in pursuance of law. The question is whether the Legislature can remit a tax regularly levied in pursuance of law. It can not do indirectly what it has not power to do directly. It can not, as we have stated, impose a tax of one mill on a part of the state, and of two mills on the rest of the state. Can it effect the same object, by levying two mills on the whole state and then remitting one mill in one or more counties? It seems to me the remission of the tax in such a case would be unconstitutional, as it would impose on the rest of the state more than its proportion of the expenses of government, which the Constitution most clearly intended to prohibit. The principle is the same when applied to individuals. Does the remission of the taxes in question come within it? I think not. In the case supposed, the tax is remitted as a favor. In the case at bar, it is remitted in pursuance of a contract between the state and relators. In the first, the state receives nothing in ex-

change. In the other, the remission of the tax is the consideration, in part, of a great public work. The state loses the tax in the one case, while in the other, it receives an equivalent for it.

Under the act of Congress donating the land, the state, I think, will have a right to be reimbursed by the General Government, or from the tolls of the canal, the taxes remitted. It was probably with a view to this, that the authority was given to remit the taxes instead of exempting the lands from taxation, as the former would give a right to future reimbursment, which the latter, in all probability, would not.

It was competent for the Legislature to have exempted the lands from taxation for the five years. But instead of doing this, for the reason stated or some other equally good reason, they authorized a remission of the taxes only; and what they might have done directly, I see no constitutional objection to their doing in the way they did.

The next question is as to the meaning of the word "sold" as used in the proviso of the supplementary act— the relators having made contracts to sell a part of the lands. The meaning of the word "sold" is not always the same. It is used, in common parlance, to designate executory as well as executed contracts for the sale of property. It is used both ways in our statutes. The cases are numerous in which it is used to designate contracts or agreements for a title to real estate, and not the title itself. On a sale of real estate on execution, the sheriff is required to give to the purchaser a certificate, stating the time when such sale will become absolute. (*Comp. L. p.* 932). When real estate is sold by an executor or an administrator, the Judge of Probate is to make an order confirming such *sale*, and directing a conveyance to be made. (*Comp. L. p.* 917). A certificate is to be given for University and school lands, at the time of the *sale* (*Comp. L. p.* 778). The Commissioner of the land office is to make

out and transmit to the secretary of the Board of Regents of the University, a statement of University lands *sold* (contracted to be sold). (*Comp. L. p.* 794). Other instances might be given, but it is unnecessary to refer to them.

The relators were to receive between seven and eight hundred thousand acres of government land, which would have to be sold in small parcels, to settlers, for agricultural or other purposes, before they could realize anything for their services in constructing the canal. It was to give them time to do this in, that the taxes were remitted. Five years were to be allowed them for this purpose, during which time the taxes were to be remitted on such of the lands as were not sold by them. Instead of selling for cash, they sell on time, requiring one quarter of the purchase money down, and the remainder in three equal annual installments; and enter into a contract with the purchaser to give him a deed on the payment of the last installment. By selling on time they receive more for their lands than they would if they sold for cash only. And by giving a contract for a deed, instead of deeding them at the time and taking back a mortgage, the unpaid purchase money is equally well secured, with greater facilities to cause payment. In this they have followed the policy of the state in selling its University and school lands, which are subject to taxation in the hands of the purchasers. It is not unusual, but quite common, for large land-holders to dispose of their lands in this way, and I am of opinion the Legislature intended to include this mode of selling lands, as well as a sale by deed.

CHRISTIANCY J.:

- I agree with my brethren in the result at which they have arrived, as to the constitutionality of the law.

As to the lands for which the contracts of sale have been made by the company, I agree with the Chief Justice, that these lands are not taken out of the act, or the contract of the state, nor rendered liable to taxation, by the contracts in question.

THE PEOPLE *v.* THE AUDITOR GENERAL.

I think these contracts do not constitute a sale, within the meaning of the term "*sold*," as used in this statute. It is true the term is sometimes used in a loose and popular sense, importing a mere executory contract of sale; and it is sometimes so used in our statutes; but this is not its natural or primary import, nor its general legal meaning. In its primary and its ordinary and legal sense, it imports a transfer of title; and it never should be construed in the loose and indefinite sense of an executory contract, unless clearly required by the context, or the subject matter. I see nothing in the context, or the subject matter, to warrant, and much less to require, such a construction here. On the contrary, the object of the Legislature in granting, and of the contractor in requiring, an exemption from taxation for a limited period, was, I think, to secure to the latter a substantial benefit from the exemption during that period — in other words, that *the title of these contractors with the state* should not, during that limited period, be imperiled or rendered of less value, by any of the burdens of taxation, or any of the risks incident to the non - payment of taxes; but when the lands should have been purchased by, or the title transferred to another, in such manner as to throw upon the latter the exclusive risk for non - payment of taxes, and to relieve the original contractors therefrom, the exemption should cease.

These contracts of the company are merely conditional contracts of sale; the title remains substantially, as well as formally, in the company; they have the right to hold this title, and the other party has no right to call for it, until the price shall be paid; it depends therefore upon contingency whether these contracts will ever result in a sale. Should the lands be taxed before the expiration of the period, and be sold for non - payment, or a lien created by the tax, the risk falls upon the company, while the sale is yet contingent, if the proposed purchaser make default—and the title which the company holds is lessened in value.

The state, I think, is as much bound by this act, and its own contract, to protect the company from the consequences of any taxation of these lands within the stipulated period, as it is bound by state policy to protect the University and school lands from taxation. The state has taken care to protect the latter from sale for taxes, at the same time that it has made the persons holding contracts of sale very similar, if not identical, in principle, to those before us, liable to the payment of taxes on the lands contracted to be sold. The state occupies, with regard to University and school lands contracted to be sold, the same position as to the title, that the company occupy in reference to the land covered by the contracts before us. And if the Legislature see fit to make provision for taxing the interest of the proposed purchasers from ·the company, or even the land itself, without making the tax a lien upon the land, or selling it for non-payment, there can be no objection, as this would not endanger or depreciate the company's title.

If the state had taken the same care not to endanger the title of these lands by taxation, in consequence of any default of the proposed purchaser, that it takes to avoid the like danger to its own title from a similar default of persons taking similar contracts, then it might be reasonably supposed the Legislature had used the term "sold" in the same sense in the two cases.

Had the company received full payment for these lands, or should an attempt be made to cloak a substantial sale under the form of an executory contract, the lands, I fully admit, would be liable to taxation as if the title had passed, but in the present cases there is no pretence of any want of good faith.

The whole of the legal, and most of the equitable, titles are in the company. I think, therefore, a mandamus should issue, as well in respect to the contracted lands as to those not contracted.

CAMPBELL J.:

I agree with my brethren that there is no constitutional objection to the act under which the lands of the relators are exempted from taxation.

I think, however, with my brother Manning, that the contracted lands are not exempt. The contracts are equivalent to *sales* in the ordinary acceptation. The holder has a right to a conveyance whenever he performs his covenants, and the company can not vary or deny his claims. Nothing but a failure to perform, enables the company to forfeit the rights of their vendee, and the contract is not then forfeited until they so declare it. The purchaser is bound in any event. The object of the state was, I think, merely to abstain from taxation so long as the company could not, within the specified period of five years, dispose of the property by sale, so as to make it in some degree productive. But to apply the term sale to nothing but a completely performed contract, would be to adopt a narrower rule than the state has applied to its own lands, which are sold upon similar terms to those in the contract before us, but which are made to bear their full burden of taxation as soon as contracted, although but partially paid for. It is true that on state lands taxes are levied as on personalty of the owner, but this is merely to prevent tax titles accruing against the public domain. But the amount of taxation is the same as if the lands were fully paid for. The term "*sold*" may be satisfied by different meanings, but I think the law fairly includes such contracts as those returned. I think a mandamus should issue for the remission of taxes on all except the contracted lands, but as to those it should not issue.

*Ordered*, that a peremptory mandamus issue, commanding the Auditor .General to remit the taxes on all that portion of the lands not sold or contracted to be sold.