THE BOARD OF SUPERVISORS OF CHIPPEWA COUNTY V.
THE AUDITOR GENERAL.

*Constitutional law—Grant of lands to aid in construction of railroad
—Exemption from taxation—Title of act—Amendment.*

1. The *power* of the State to exempt from taxation for a limited period
   lands granted in aid of the construction of railroads is not an
   open question.  *People v. Auditor General,* 7 Mich. 84; *People
   v. Auditor General,* 9 Id. 134.

2. An act of the Legislature was entitled "An act to authorize and
   empower the Board of Control of State Swamp Lands to make
   an appropriation of State swamp lands to aid in the construction
   of a railroad" between given points.
   *Held,* sufficient to cover the exemption from taxation of the
   lands granted for a limited time.

3. An amendment of an existing law, which could have been in-
   serted without repugnance in the original act, is not such a
   departure as to avoid the statute.

Mandamus to set aside rejection by Auditor General of
taxes assessed on railroad lands.  Submitted February 10,
1887.  Denied April 14, 1887.  The facts are stated in the
opinion.

*Blair, Wilson & Blair,* for relator.

*William H. Wells (Ashley Pond,* of counsel), for respond-
ent.

CAMPBELL, C. J.   The Auditor General rejected taxes
levied on lands granted by the State to the Detroit, Mackinac
& Marquette Railroad Company to aid in the construction of
its road; the ground of rejection being an agreement made
that such lands should not be taxable within 16 years, unless
previously disposed of.   Relators, representing Chippewa
county, now seek to have the Auditor General's rejection

held invalid, so that taxes·may be levied on these, as on ordinary private lands.

By Act No. 36 of the Legislature of 1873, entitled "An act to authorize and empower the Board of Control of State Swamp Lands to make an appropriation of State swamp lands to aid in the construction of a railroad from the straits of Mackinac to Marquette harbor, on Lake Superior," the Board of Control received authority to appropriate 10 sections per mile to any company that should complete and have its road in running. order by December 31, 1875. The board also were to—

"Have full power and authority over said lands, the reservations necessary, and the limitations and privileges requisite, in the application of such lands to such purpose."

But this was qualified by certain provisos, one of which was—

"That said appropriated lands shall become taxable as soon and as fast as they are earned by the company constructing said railroad."

Several subsequent amendatory acts were passed, which were somewhat more liberal in their provisions, but only one of which bears on the taxation of the lands. By Act No. 81, Laws of 1875, being "An act to amend sections one, two, and three of an act entitled [as before quoted], and an act amendatory thereof, approved March 24, 1874," a provision was introduced which is the basis of exemption as claimed. Section 2 was so amended as, among other things, to leave out the clause making the lands taxable at once,· and in lieu thereof this proviso was put in:

"And provided, further, that the said Board of Control shall make no contract exempting said lands from taxation for any period longer than the time during which they shall remain unsold by the railroad company which shall become entitled to the privileges of this grant: *Provided*, No such exemption shall in any event be for a longer term than sixteen years from the time such lands are patented."

Other amendments have been made since, but not affecting this proviso.

No company undertook the work until after some further legislation in 1879, although an abortive contract had been made and annulled. On the fourth of September, 1879, the Board of Control let the contract to the Detroit, Mackinac & Marquette Railroad Company, which undertook to build and equip a railroad in the manner required by the statutes, and particularly described in the contract. In this contract, in accordance with the act of 1875, it was agreed—

" That the lands hereby appropriated for the construction of said railroad (unless sooner sold or contracted to be sold by said railroad company) shall be and remain exempt from all taxation for the period of 16 years from and after the time said party of the first part or its assigns shall, under this contract, be entitled to patents therefor. But whenever said railroad company shall sell or contract to sell any of said lands so appropriated, then all of said lands so sold, or contracted to be sold, by said company, shall be subject to taxation the same as other lands. But it is expressly understood that the mortgage of said lands pursuant to the provisions of this contract shall not operate to render the lands so mortgaged subject to taxation," etc.

On June 1, 1881, the railroad company executed a mortgage in trust to Francis Palms and James McMillan to secure the payment of 4,560 bonds of $1,000 each, covering the lands now in controversy. It was suggested, but not very strenuously argued, that this instrument should be considered a sale, and not a mortgage. But it appeared to us on the argument, as it now appears, that it is not only spoken of in its own terms throughout as a mortgage, but it is in no way to be distinguished from the familiar securities to secure railway bonds, which are treated by statute, as well as by legal analogies, as mortgages in the ordinary sense of the term. We do not think this document is a sale, or anything else than it purports to be.

The contest is upon the legal validity of the exemption

provision in the contract between the Board of Control and the railroad company. The stipulation is not uncertain, and the only question is whether the board had power to make it.

The objection that the State has no power to exempt these lands from taxation for a limited period was very strongly urged, but we do not think it is now an open question in this State. Precisely the same question came up in the case of *The People v. Auditor General*, 7 Mich. 84, where an agreement had been made with the contractors of the Sault Ste. Marie canal to exempt their unsold lands from taxation for a period of five years. It was held in that case, by the unanimous opinion of all the judges, that there was no constitutional objection to such legislation. The judges differed concerning what amounted to a sale, but agreed in exempting lands unsold. It is hardly necessary to repeat the reasoning of that case, which has never been departed from or questioned. The same policy has several times been acted on here, as well as in other states. In the legislation which was had upon the admission of Michigan into the Union, there was a stipulation against taxing bounty lands, granted for services in the war of 1812, for three years after the issue of patents. In *People v. Auditor General*, 9 Mich. 134, a *mandamus* was issued requiring the Auditor General to cancel taxes on such lands, assessed more than three years after location, but less than three years from the date of the patent.

It is not the duty of courts to inquire into the consideration of legislative grants or exemptions. But in the present case it is manifest that whatever privileges were allowed were given for the express purpose of furthering improvements designed to open to settlement a country that needed opening, and thereby to bring within the influences of settlement a large amount of property which could not become taxable until in private hands, and which would not become enhanced in value until it could be made profitable for use.

That is the only way in which taxable property can be enlarged; and, if the Legislature regarded a temporary exemption from taxes as likely to be a profitable measure for the future financial interests of the State and county, it was for them, and not for us, to say whether the case warranted it.

A question is also raised whether the statute which was acted on legally authorized the action. We have no doubt the exemption clause is within the general purpose of the statute as indicated by its title. The title was—

"To authorize and empower the Board of Control of State Swamp Lands to make an appropriation of State swamp lands to aid in the construction of a railroad from the straits of Mackinaw to Marquette harbor, on Lake Superior."

This title would certainly indicate that the terms and conditions of the appropriation would be considered and regulated in the body of the statute, and any such terms and conditions which could lawfully be made would come within its purview. The title is as specific as titles can conveniently be made. Had it undertaken to set out all the varied conditions and acts which the body of such a statute contains, it might be difficult to treat it as not verging on multifariousness, and what would be variance in the body of the act would be duplicity in the title. Legislation would be impracticable under such restrictions.

Neither do we think there is any force in the objection that the amendment of 1875 is such a departure as to avoid the statute. If it could have been inserted without repugnance in the original act, it cannot be a variance to introduce it as an amendment. It stands as one of the conditions on which the board had power to make the appropriation, and it cannot be claimed that such conditions could not be changed or amended by the Legislature so as to enable the board to contract on such terms as should be found desirable.

It is, however, insisted that this proviso assumes that cer-

tain powers had been given to the board which had not actually been given, and that there is nothing for it to act on. Under the original act, the same question would have arisen more directly. The "full power and authority over said lands, the reservations necessary, and the limitations and privileges requisite, in the application of such lands to such purpose," were given, with a *proviso* that the lands should become taxable as soon as earned. It is altogether likely that they would have become so without the proviso, but it was nevertheless a proper and usual exercise of caution to exclude any chance for dispute. The change from that *proviso* to one of exemption is equally proper in form. Whether or not the power was considered as already granted is not material. All that is material for us to know is whether we can gather from this statute what the Legislature intended. If that intent is intelligibly expressed, we are bound to carry it out, and not to allow it to be defeated by verbal criticism. The intent here could not have been made clearer, and must be respected.

We think the Auditor General put the right construction on the law in rejecting the taxes, which were not lawfully imposed. The *mandamus* must be denied.

The other Justices concurred.