# CASES DETERMINED

AT THE

## *January Term, 1881.*

---

THE WISCONSIN CENTRAL RAILROAD COMPANY VS. TAYLOR COUNTY and others.

*February 9 — April 19, 1881.*

CONSTITUTIONAL LAW: TAXATION. *Power of the legislature to tax, and to exempt from taxation.*

1. No tax can be imposed upon lands while they remain the property of the United States.

2. No tax can be imposed upon lands granted by the United States to the state in trust for works of internal improvement, and as to which the trust has not been executed.

3. When such lands have been earned by a railroad company under such a grant, and the state and the United States have each parted with all right, title and interest therein, to the company, by patents regularly issued, they become relieved, *pro tanto*, of the trust implied in the grant, and subject to the legislative will in the imposition of taxes.

4. The state legislature may exercise all legislative power not delegated to the general government, nor restricted nor reserved to the people by the state or national constitution.

5. A constitutional provision subject to construction should be construed in the light of the circumstances and discussions which led to its adoption, and similar provisions existing in other state constitutions at the time, as well as subsequent adjudications upon the meaning of the words employed.

6. Thus construing sec. 1, art. VIII of the constitution of this state, the decision of this court in *Milwaukee & Mississippi Railroad Company v. Waukesha County*, 9 Wis., 449, is approved, and everything inconsistent therewith in subsequent opinions of the court is disapproved.

7. Taxes can be levied only upon such property as the legislature shall prescribe.

8. The legislature has power to prescribe not only the property to be taxed, but the rule by which it must be taxed; and the only limitation of that power is, that the rule shall be uniform.

9. The power to prescribe what property shall be taxed necessarily implies the power to prescribe what property shall be exempt.

10. While the lands here in question were held by the state in trust for the building of a proposed line of railroad now owned by the plaintiffs, and hence were not subject to taxation, the legislature had the power, in furtherance of that object and in execution of the trust, to exempt such lands from taxation for a term of years; and such power, having been exercised, could, within the discretion of the legislature, be exercised anew by granting an extension of the exemption.

11. Chapter 21, Laws of 1877, "An act to extend the time of exemption from assessment and taxation of certain lands, fixed in the act incorporating the Winnebago & Lake Superior Railroad Company, approved April 6, 1866, and in the act incorporating the Portage & Superior Railroad Company, approved April 9, 1866," is valid.

APPEAL from the Circuit Court for *Columbia* County.

Action against a county, its treasurer and clerk, to restrain the execution of deeds upon certificates of the sale of certain lands of the plaintiff as for delinquent taxes. Plaintiff alleged that the lands were exempt from taxation at the times when the tax sales in question were made. The ground upon which the claim was based will sufficiently appear from the opinion. A general demurrer to the complaint was overruled, and judgment rendered in plaintiff's favor. From that judgment defendants appealed.[1]

---

[1] On the 6th of April, 1866, an act was passed by the legislature of this state, entitled "An act to incorporate the Winnebago & Lake Superior Railroad Company, and to execute the trust created by sec. 3 of the act of congress, entitled 'An act granting lands to aid in the construction of certain railroads in the state of Wisconsin,' approved May 5, 1864." (Ch. 314, P. & L. Laws of 1866.) This act contained the following among other provisions: "Sec. 1. . . . Said company may take, hold or occupy all such lands as may be given or granted to it by this state, or by the government of the United States, or both, for the purpose of aiding in the construction of any of its railroads; and after such last mentioned lands are so as above given or granted to said company, it may, subject to the terms, . . . and limitations contained in such gift or grant, sell and convey the same," etc. Sec. 2

The Wisconsin Central Railroad Co. vs. Taylor County and others.

For the appellants there were separate briefs, one signed by *J. K. Parish*, their attorney, with *E. L. Browne*, of counsel, and the other signed by *Mr. Parish* with *S. U. Pinney*, of counsel; and there was also oral argument by *Mr. Browne* and *Mr. Pinney*.

For the respondent there was a brief by *Edwin H. Abbot*, its attorney, and oral argument by *Mr. Abbot* and *Wm. F.*

authorizes the company to construct and operate a railroad from Doty's Island to Bayfield, and thence to Superior, on Lake Superior, by way of Waupaca and Stevens Point, with a proviso that from Stevens Point to Superior the road should be constructed and operated by said company jointly with another company which might be authorized to construct and operate a road from Portage City to Stevens Point; and there was a further provision authorizing the consolidation of the two companies. Sec. 7 provided that the company created by the act should be entitled to land in the manner specified in that act and in the act of congress above mentioned, as the road should progress from Stevens Point; with a proviso that the road might be constructed between Bayfield and Superior, or for one hundred miles in a southerly direction from Bayfield, and the company or companies authorized to build it should thereupon be entitled to receive all the lands applicable to that purpose. Sec. 8 provides as follows: "The company hereby created shall be entitled to and invested with the title to one equal undivided half of the lands pertaining to that portion of the road of said company which shall be so located and constructed from Stevens Point to Superior, and all and singular the rights, privileges and immunities granted or conferred, or intended to be granted or conferred, by section three of the act of congress" above mentioned. "Said company shall also be subject to all the restrictions, impositions, duties and obligations contained in said act of congress, so far as the same are applicable to the company hereby created, or to the road hereby authorized to be constructed: *provided*, that the title to the lands in this section mentioned and contemplated, shall not vest in said company sooner or faster than the lands might be sold, as provided and declared in the aforesaid act of congress; and the said lands are hereby granted in consideration of the company so hereby created complying with the terms of the grant hereby made and of the aforesaid act of congress." Sec. 11. "The company hereby created shall be capable in law of taking and holding any land granted by the government of the United States, or of this state, to aid in the construction of railroads, which shall be conveyed to said company by this act or deed, or by the operation of law; and may also mortgage or pledge or otherwise dispose of all their rights, title, interest, claim or demand of, in or to any lands or interest in lands granted to said company by this act, and in any other estate, real,

The Wisconsin Central Railroad Co. vs. Taylor County and others.

*Vilas.* Briefs by *P. L. Spooner* and *J. C. Spooner*, prepared in causes tried in the federal courts involving the questions determined in this case, were also filed by leave of the court.

For the appellants it was contended, that ch. 21, Laws of 1877, under which the respondent claims its lands exempt from all taxation, is unconstitutional and void. The "essential characteristics of any system of taxation, properly so called, are

personal or mixed, of which they may be seized at the time of execution of such mortgage, or which they may acquire subsequently thereto, and in such manner and on such terms as the directors may think proper; and within five years after the title of such lands shall have become vested in said railroad company, so much of them as may remain unsold, shall be offered for sale in limited quantities, at fair prices, preference being given to actual settlers." Sec. 21 contains the following among other provisions: "The lands granted or intended to be granted by the provisions of this act to the company hereby created, shall be and hereby are exempt from all assessments and from all taxation whatsoever, for the term of ten years from the taking effect of this act, unless said company shall sooner sell or convey the same; and so much of said lands as shall be sold or conveyed by said company within said ten years, shall be subject to assessment and taxation, from time to time, as the same shall be as aforesaid sold and conveyed."

On the 9th of April, 1866, the legislature passed "An act to incorporate the Portage & Superior Railroad Company, and to execute the trust created by an act of congress entitled 'An act granting lands to aid in the construction of certain railroads in the state of Wisconsin,' approved May 5, 1864." The corporation created by this act was authorized to construct a road from the city of Portage by way of the cities of Ripon and Berlin to Stevens Point, and thence to Bayfield and Superior; was required to commence the construction of said road at the city of Portage; and was granted rights to an undivided half of the lands granted by said act of congress, and an exemption of said lands from taxation for a period of ten years, in terms similar to those found in the act of April 6.

On the 17th of February, 1877, the legislature passed an act (ch. 21, Laws of 1877) extending for three years the time during which the lands granted to the above named companies should be exempted from all taxation. Sec. 2 of this act is as follows: "It is hereby declared to be the object of this act to insure the completion of the Wisconsin Central Railroad, and to secure the advantages therefrom arising; and the privileges and exemptions hereby granted are in consideration and on the express condition of the renewing of the work of construction by said company and the completion of said road to Lake Superior within the current calendar year."

certainty, equality and universality. All the persons or property within a state, district, city or other fraction of territory having a local sovereignty for the purpose of taxation, should, as a general rule, constitute the basis of taxation." *State v. Charleston*, 12 Rich. Law, 702, 732; *O'Neal v. Bridge Co.*, 18 Md., 1, 23. See remarks of GIBSON, C. J., in *Kirby v. Shaw*, 19 Pa. St., 260; *Williams' Case*, 3 Bland's Ch., 186, 253; Cooley on Taxation, 124–130; *Durach's Appeal*, 62 Pa. St., 494; *Fletcher v. Oliver*, 25 Ark., 295; *State v. Parker*, 32 N. J., 435; *Mayor, etc., of Nashville v. Althrop*, 5 Cold., 554. Various constitutional provisions by way of restraint have been devised to secure fair and equitable systems of taxation, and to protect the people from the abuse of a power which would otherwise be unlimited. As the power of taxation is a legislative one (Sedgwick on Stat. & Con. Law, 554; Cooley on Taxation, 33, 35; Burroughs on Taxation, § 4; *Hardenburgh v. Kidd*, 10 Cal., 402; *Heine v. Levee Comm'rs*, 19 Wall., 660), and cannot be delegated to ministerial officers or even to another department of the government *(Brewer Brick Co. v. Brewer*, 62 Me., 62), and as the power of the legislature in this country, except as restrained by constitutional provisions, is, in matters within its department, as supreme, absolute and unlimited as the power of parliament (Sedgw. on Stat. & Con. Law, 148 et seq.; *Cochran v. Van Surlay*, 20 Wend., 365; *People v. Morrell*, 21 id., 563; *Butler v. Palmer*, 1 Hill, 324; *Guilford v. Chenango Co.*, 13 N. Y., 143), all constitutional provisions touching the legislative power, or matters within its scope, are to be construed as limitations and restraints. They are not in the nature of grants or enabling provisions. *Bushnell v. Beloit*, 10 Wis., 225. Sec. 1, art. VIII of the state constitution, was intended, therefore, to restrict the legislature in the exercise of its otherwise unlimited power over the subject of taxation. The guaranty that "the rule of taxation shall be uniform" is the cardinal provision to which the power of the legislature in prescribing subjects of taxation is sub-

ordinated. It was intended to secure to the people of the state not regularity in the form and manner only of taxation — not merely uniformity in the way in which unjust and unequal burdens should be imposed,— but substantial protection against unjust and unequal burdens themselves. The *rule* of taxation is found in the law passed to execute the legislative power; and that part of the law which prescribes the subjects of taxation, or kinds of property to be taxed, is a part of the rule of taxation equally with those provisions which regulate the rate and method. When the state was organized and before any legislation had taken place, there was no law or rule of taxation under the constitution. It was the duty of the legislature to provide a uniform rule on that subject; and it was not possible to provide such rule as to rate or method, without at the same time prescribing what should be subject to taxation. The latter clause of the section in question requires the legislature to determine the character or kinds of property to be taxed, and the uniform rule requires that *all* property of that character or kind be subjected to taxation. The language used in *Knowlton v. Supervisors*, 9 Wis., 420, and *Hale v. Kenosha*, 29 id., 603, was not intended to express a contrary doctrine. In those cases the attention of the court was not directed to the question as to uniformity in respect to subjects of taxation. And in none of the cases hitherto brought before this court was there involved the question of arbitrary exemption of a specific article belonging only to one person. The right to exempt property would exist as a necessary incident of the power of taxation, without section 1, art. VIII of the constitution. The latter part of that section, therefore, as well as the former, must operate by way of limitation and not as a grant. *Durach's Appeal*, 62 Pa. St., 494; *Butler's Appeal*, 73 id., 448; *Hill v. Higdon*, 5 Ohio St., 245; *Bushnell v. Beloit*, 10 Wis., 225; *People v. McCreery*, 34 Cal., 433. The language of the provision indicates the intention to restrict the power of the legislature, (1) to the

imposition of taxes on *property*, as distinguished from capitation or income taxes; (2) to prescribing the kinds or classes of property to be taxed. Taxation upon property as it shall happen to belong to A. or B., is clearly and by irresistible implication forbidden. The uniformity required must extend to all property of any particular class so that it may be taxed or exempted alike. The object of the constitution was justice and fairness in the system of taxation. Cooley on Taxation, 152; *Exchange Bank v. Hines*, 3 Ohio St., 1; *Pine Grove v. Talcott*, 19 Wall., 675; *Gilman v. Sheboygan*, 2 Black, 510; *Sutton's Heirs v. Louisville*, 5 Dana, 31. See argument of E. G. Ryan in *Mil. & Miss. R. R. Co. v. Supervisors*, 9 Wis., 439–445; *State ex rel. Att'y Gen. v. Plank Road Co.*, 11 id., 40, 41; *Kneeland v. Milwaukee*, 15 id., 463; *New Orleans v. Davidson*, 30 La. Ann., 555; *State v. Poydras*, 9 id., 165; *City v. Kaufman*, 29 id., 283. 2. The exemption cannot be sustained upon the plea that it is necessary to secure to the public the benefit of the road. Under sec. 10, art. VIII of the constitution, the state has no power to appropriate its revenues in aid of works of internal improvement. If it may not appropriate for such purpose money already raised, it is equally plain that it cannot exercise the power of taxation to raise the money either in whole or in part necessary to complete such works. And there is no material difference between exempting the property of a corporation in aid of such a project, and raising a sum by taxation equal to what its taxes would be, and donating it to the corporation for such purpose. The prohibition is broad and comprehensive, and should be construed and applied in the light of the policy in which it had its origin. No debt should be contracted for such purpose; and no public moneys should be used for such purpose, or applied to any use essentially private. *State v. Farwell*, 3 Pin., 409; *Bushnell v. Beloit*, 10 Wis., 221; *Whiting v. R. R. Co.*, 25 id., 167; *People v. Salem*, 20 Mich., 452; *Lowell v. Boston*, 111 Mass., 454; *Brewer Brick Co. v. Brewer*, 62

Me., 62; *Bay City v. Treasurer*, 23 Mich., 504; *Allen v. Jay*, 60 Me., 124. 3. Arguments from contemporaneous construction and *ab inconvenienti* can have little weight. "No length of usage can enlarge legislative power, and a wise constitutional provision should not be broken down by frequent violations." *People v. Allen*, 42 N. Y., 384; Cooley on Con. Lim., 85, 86. In construing constitutions, courts can have nothing to do with the argument *ab inconvenienti*, and should not "bend the constitution to suit the law of the hour." *Greencastle v. Black*, 5 Ind., 564; *Oakley v. Aspinwall*, 3 N. Y., 568; *Sadler v. Langham*, 34 Ala., 311, 334; Cooley on Con. Lim., 86, note. 4. The act of exemption relied on did not create contract relations or obligations between the respondent and the state. It was a mere gratuity, and an act of public bounty. *Welch v. Cook*, 97 U. S., 541; *West Wis. Railway Co. v. Supervisors*, 93 id., 595. And if the act is obnoxious to the objection that it violates the constitutional rule of uniformity of taxation, it is plain that no valid contract could be made between the state and the company, whereby the right of taxation of these lands was to be for any consideration relinquished. *Railroad Companies v. Gaines*, 97 U. S., 697, 709. The power of taxation is a part of the sovereign power of the state, vested in the legislature, and it is not the subject of contract or sale by the legislature, and any contract by the trustee in whom it is vested to alien it either permanently or temporarily is void. *M. & T. Bank v. Debolt*, 1 Ohio St., 591, 600; *Debolt v. L. I. & T. Co.*, id., 563, 580; *West Wis. Railway Co. v. Trempealeau Co.*, 35 Wis., 265; *State v. Hastings*, 12 id., 47. 5. The lands in question were not exempt under the land grant act of May 5, 1864. See *North Wis. Railway Co. v. Barron County*, C. C. U. S., West Dist. Wis.; *Tucker v. Ferguson*, 22 Wall., 527, 575; *Weston v. Supervisors*, 44 Wis., 242, 256; Cooley on Taxation, 54; *West Wis. Railway Co. v. Trempealeau Co.*, 93 U. S., 598. 6. Ch. 21, Laws of 1877, is a special or private law. It was an amend-

The Wisconsin Central Railroad Co. vs. Taylor County and others.

ment to sec. 21, ch. 314, and sec. 22, ch. 362, P. & L. Laws of 1866. The respondent company is a private corporation, and the act creating it is a private law. *Burhop v. Milwaukee*, 21 Wis., 259. The act in question is therefore unconstitutional and void under sec. 31, art. IV of the state constitution. *Kimball v. Rosendale*, 42 Wis., 407.

In behalf of the respondent it was argued:

1. The county appellant derives all its powers from the legislature, and is absolutely dependent for its existence upon that body. It has no vested rights against the state, and this creature cannot question the validity of the acts of its creator. The state has not conferred upon it any authority to disobey its laws, or to go behind any of its acts relative to taxation. The county is not a party competent to take or maintain this appeal. *U. S. v. Railroad Co.*, 17 Wall., 329; *City of Richmond v. Daniel*, 14 Gratt., 385; *Virginia & Tenn. R. R. v. Washington Co.*, 30 id., 471; *S. C.*, 7 Reporter, 250. 2. The taxes enjoined in this suit are invalid because they impair the obligation of a contract protected by the constitution of the United States. Ch. 21, Laws of 1877, in legal effect, merely assured, for a term, against taxation, certain lands which were already protected against taxation by the terms of the original grant from the United States to Wisconsin on May 5, 1864. The construction of the act of May 5, 1864, under the law of trusts applicable to the donee of lands under its third section, is a case of novel impression, and a question of ultimate federal cognizance. 3. These lands were not on February 21, 1877, and never had been, taxable. They could not be assessed until May, 1877, and did not form any part of the body of taxable property in Taylor county when ch. 21 was passed. That act did not, therefore, take anything out of the body of taxable property, nor make any exemption. It may be supported (without passing upon the broad question of the power of the legislature to exempt property from taxation), simply as fulfilling, by an amendment of corporate

charters, the original trust stamped upon these lands in 1864, 1865 and 1866. 4. Ch. 21, Laws of 1877, if it be regarded simply as an act exempting from taxation property then taxable, is valid under the constitution of Wisconsin. (1) "The constitutional requirement of equality and uniformity extends only to such objects of taxation as the legislature shall determine to be properly subject to the burden. The power to determine the persons and the objects to be taxed is trusted exclusively to the legislative department." Cooley on Con. Lim., 514, 515; Cooley on Taxation, 3, 4, 32; Potter's Dwarris, 402; Burroughs on Taxation, § 53; *State v. North*, 27 Mo., 464. That the general right to make exemptions from taxation is involved in the right to apportion taxes, and must be understood to exist wherever it is not forbidden, is a doctrine so thoroughly established as matter of law, as to require no citation of authority. All legislatures have acted upon that rule, and all courts have united in its establishment. Sec. 1, art. VIII of the constitution, has heretofore been so construed by this court as to sustain exemptions. In the earliest reported case, *Mil. & Miss. R. R. Co. v. Supervisors*, 9 Wis., 431, note, the court affirmed the power to take a license fee in lieu of taxes. It was not disputed that such license fee was less than the amount which would have been raised by regular taxation. This doctrine was denied in *Knowlton v. Supervisors*, 9 Wis., 410, and in *State v. Plank Road Co.*, 11 id., 34, but finally reäffirmed in *Kneeland v. Milwaukee*, 15 id., 454, and now stands as the law of the state. In none of these cases was denied the right to exempt altogether, and the law as it now stands amounts to a recognition of the right to partially exempt; for the license fee is a commutation of a tax, and amounts in substance to a tax, by whatever name it be called. If such right of partial exemption exists, the right to exempt absolutely follows as a logical conclusion. See also *Hale v. Kenosha*, 29 Wis., 599; *West Wis. R. R. Co. v. Supervisors*, 35 id., 257; *Weston v. Supervisors*, 44 id., 242.

(2) The weight of adjudication in other states is clearly thrown in favor of the legislative power to select, uncontrolled, what property shall be taxed, and what shall be exempt from taxation. The legislative power must be clearly shown to be limited; otherwise it must be held to be controlled only by the rules of general constitutional law which define what legislative power is. *Knoxville & Ohio R. R. Co. v. Hicks,* 1 Tenn. Leg. Rep., 338; *S. C.,* 15 Am. R'y Rep., 197; *Portland v. Water Co.,* 67 Me., 135; *People v. Auditor Gen.,* 7 Mich., 84; *Charleston v. Vestry, etc.,* McMullan's Eq., 139; *State Bank v. Charleston,* 3 Rich. Law, 342; *Bank v. New Albany,* 11 Ind., 139; *Connersville v. Bank,* 16 id., 105; *King v. Madison,* 17 id., 48; *New Orleans v. Fourchy,* 30 La. Ann., 910. (3) The supreme court of the United States has held, in a long line of decisions, that, in the absence of express constitutional inhibition, the legislature of a state may lawfully exempt from taxation the property and franchises of a corporation, and that a state may even barter away, beyond recall, its right to tax, by a valid contract. *State of New Jersey v. Wilson,* 7 Cranch, 164; *Providence Bank v. Billings,* 4 Pet., 514; *State Bank v. Knoop,* 16 How., 369; *Ohio L. I. & T. Co. v. Debolt,* id., 416; *Gordon v. Appeal Tax Court,* 3 id., 133; *R., F. & P. R. R. Co. v. R. R. Co.,* 13 id., 71; *Dodge v. Woolsey,* 18 id., 331; *Jeff. B. Bank v. Skelly,* 1 Black, 436; *McGee v. Mathis,* 4 Wall., 143; *Von Hoffman v. Quincy,* id., 535; *Home of the Friendless v. Rouse,* 8 id., 430; *Wilmington Railroad v. Reid,* 13 id., 264; *R. & G. R. R. Co. v. Reid,* id., 269; *Salt Co. v. East Saginaw,* id., 373; *Tomlinson v. Jessup,* 15 id., 454; *Tomlinson v. Branch,* id., 460; *Humphrey v. Pegues,* 16 id., 244; *Delaware Railroad Tax,* 18 id., 206; *P. R. R. Co. v. Maguire,* 20 id., 36; *R. R. Co. v. Pennsylvania,* 21 id., 492; *Bailey v. Magwire,* 22 id., 215; *Farrington v. Tennessee,* 95 U. S., 679; *Mackall v. Canal Co.,* 94 id., 308; *Hoge v. R. R. Co.,* 99 id., 348; *Wells v. R. R. Co.,* 14

Blatchf., 426; *Gilman v. Sheboygan*, 2 Black, 510. (4) The debates and proceedings of the constitutional convention on the adoption of sec. 1, art. VIII [cited by counsel at length], show the intention of that body to leave the matter of exemption entirely to the discretion of the legislature; and it is competent to examine such proceedings in order to ascertain the proper construction of the constitutional provision. *Coutant v. The People*, 11 Wend., 511; *Clark v. The People*, 26 id., 599; *People v. Purdy*, 2 Hill, 31; *People v. R. R. Co.*, 24 N. Y., 496; *State v. Kennon*, 7 Ohio St., 563; *Gardner v. Collector*, 6 Wall., 499; *Rex v. Jefferies*, 1 Strange, 446; *Spring v. Eve*, 2 Mod., 240; Cooley on Con. Lim. (2d ed.), 65. Matters of public notoriety, and the condition of things leading to a statute, are judicially known to the court. *U. S. v. U. P. R. R. Co.*, 91 U. S., 72. [Counsel cited, as instances of exemptions under general laws, R. S. 1849, ch. 15, sec. 4, and ch. 27, sec. 22; R. S. 1858, ch. 18, sec. 4; R. S., sec. 1038; also one hundred and thirty-four instances of exemptions created by special legislative enactment.] Where a particular construction of a constitutional provision has been generally accepted as correct, and especially when this has occurred contemporaneously with the adoption of the constitution, and by those who had an opportunity to understand the intention of the instrument, there is a strong, if not a conclusive, presumption that the practical construction so given rightly interprets the intention. And this is true, as well, of statutes. *Stuart v. Laird*, 1 Cranch, 95; *Martin v. Hunter's Lessee*, 1 Wheat., 351; *Cohens v. Virginia*, 6 id., 418; *Bank v. Halstead*, 10 id., 51; *Ogden v. Saunders*, 12 id., 290; *O. L. I. & T. Co. v. Debolt*, 16 How., 431; *Minor v. Happersett*, 21 Wall., 177; *Dean v. Borchsenius*, 30 Wis., 246; *Scanlan v. Childs*, 33 id., 666; *U. S. v. B. & M. R. Railroad Co.*, 98 U. S., 334. (5) Sec. 1, art. VIII of the constitution, consists of two distinct and equally important clauses, and the order in which they are printed or read is immaterial. One clause is

a limitation upon the executive and judicial departments by vesting exclusively in the legislature the selection of taxable property. The other clause is a limitation on the legislature by compelling them to tax by a uniform rule whatever property they prescribe for taxation. Both clauses leave the reserved power of selection of taxable property in the legislative body. The constitution is to be considered, not as a grant of powers, but as in the nature of a restriction or limitation. *People v. Coleman,* 4 Cal., 46; *Munn v. Illinois,* 94 U. S., 113, 124. The provision in question protects the people, first, against every form of taxation which the legislature does not order; and second, against an unequal system of imposition upon such property as the legislature shall select. *People v. McCreery,* 34 Cal., 432, 451. (6) Ch. 21, Laws of 1877, is not invalid under subd. 7, sec. 31, art. IV of the constitution. It grants no corporate powers or privileges. The exemption of lands from taxation is in no sense a corporate grant, because it would be equally available to any individual donee of the grant. It does not change any of the chartered powers or privileges. It simply prevents these lands from falling into the grand body of taxable property. *U. S. Exp. Co. v. Ellyson,* 28 Iowa, 371; *McAunich v. R. R. Co.,* 20 id., 339. Moreover, that provision of the constitution, adopted as an amendment in 1871, does not apply to the charters of the respondent, which were granted in 1866. *Att'y General v. Railroad Companies,* 35 Wis., 425, 561. (7) If there is any doubt on the question of the constitutionality of ch. 21, Laws of 1877, it must be resolved in favor of its validity. *Munn v. Illinois,* 94 U. S., 124. 5. Ch. 21, Laws of 1877, is a contract, made upon a valuable consideration passing between the state and the respondent. It has been executed by parties who acted in reliance on it, and is valid under the constitutions of the United States and of Wisconsin, as construed by the supreme court of the United States before the parties so acted. It is now too late to question its validity under the constitu-

tion of Wisconsin. The taxes in question, even if valid under the law of the state, will be declared invalid in this forum if they are void under the supreme law of the land. Before ch. 21 was enacted, the supreme court of the United States had substantially decided that the legislature of Wisconsin could make valid exemptions of property from taxation. *Gilman v. Sheboygan*, 21 Black, 510. The same court had also declared the validity of contracts for exemption upon sufficient consideration passing between the state and the party in any form. The consideration need not be a direct pecuniary return. It is sufficient if the state has apparently found it for its interest to assume the obligation, and that some one has acted in reliance on it. Cooley's Principles of Com. Law, 305; *New Jersey v. Wilson*, 7 Cranch, 164; *Pacific R. R. v. Maguire*, 20 Wall., 36; *University v. People*, 99 U. S., 309. And that court determines for itself whether or not such contract exists, whatever may be the decision of the state court. *Railroad Co. v. Rock*, 4 Wall., 177; *Railroad Co. v. McClure*, 10 id., 511; *Knox v. Exchange Bank*, 12 id., 379; *University v. People*, 99 U. S., 309. It is true that exemptions made as a mere gratuity and favor may be repealed at any time at the will of the legislature. *Salt Co. v. East Saginaw*, 13 Wall., 373; *Home Ins. Co. v. City Council*, 93 U. S., 116; *West Wis. Railway v. Trempealeau Co.*, id., 595; *Welch v. Cook*, 97 id., 541. But this case does not involve any question of legislative power to repeal. The supreme court of the United States has also decided that adverse judicial constructions, whether of a constitution or a statute, which are made by a state court after a contract has been made, and *a fortiori* after it has been performed, do not prejudice the rights of the party who so performed in reliance upon an earlier, favorable construction by that court. *Gelpcke v. Dubuque*, 1 Wall., 175; *City v. Lamson*, 9 id., 477; *Lee County v. Rogers*, 7 id., 181; *Havemeyer v. Iowa Co.*, 3 id., 294; *Ohio L. I. & T. Co. v. Debolt*, 16 How., 432. This court, therefore, in obedience to

the supreme law of the land, must, in this suit, hold ch. 21, Laws of 1877, valid under the settled law of the United States, whatever its own abstract view might now be of the conformity of such exemptions to the constitution of the state.

CASSODAY, J. This action was brought to restrain the defendants from levying any tax upon or collecting the same from the lands described of the plaintiff, on the ground that they were exempt from taxation. It is urged, upon the part of the plaintiff company, that the lands in question could not be subjected to taxation by the state or any of its municipalities, for the reason that they were acquired by the plaintiff under a grant from the United States, for the purpose of aiding in the construction of the plaintiff's railroad, and for no other purpose.

MARSHALL, C. J., in *M'Culloch v. Maryland*, 4 Wheat., 429, said: "All subjects over which the sovereign power of a state extends, are objects of taxation; but those over which it does not extend, are, upon the soundest principles, exempt from taxation." Again: "*That the power to tax involves the power to destroy;* that the power to destroy may defeat and render useless the power to create; that there is a plain repugnance in conferring on one government a power to control the constitutional measures of another, which other, with respect to those measures, is declared to be supreme over that which exerts the control,— *are propositions not to be denied.*" Id., 431.

In *Railway Co. v. McShane*, 22 Wall., 444, it was held "that lands on which the costs of survey have not been paid, and for which the United States have not issued a patent to the company, are exempt from state taxation." In *Ross v. Outagamie Co.*, 12 Wis., 38, COLE, J., said: "It is conceded that, so long as the land remains a part of the public domain of the general government, it is not subject to taxation." Section 2, art. II of the constitution of this state, expressly pro-

vides, among other things, that "no tax shall be imposed on land the property of the United States." So, as to lands which the state held title to as mere trustee of the United States, and as to which the trust remained unexecuted, the power of state taxation would not apply. In *Tucker v. Ferguson*, 22 Wall., 572, where the grant to Michigan by congress was substantially like this to Wisconsin, SWAYNE, J., said: "Upon general principles she (the state) could not tax the lands while the title remained in the United States, nor while she held them as the trustee of the United States, which, in the view of the law, was the same thing."

These propositions are virtually conceded by counsel for the defendants; but they maintain that, as soon as the plaintiff perfected its title to the lands and acquired the right to sell them, the case assumed an entirely different aspect, and they at once became subject to taxation by the state. On the other hand, it is claimed that the plaintiff company was merely the instrumentality or agent through which the state was executing the trust assumed, and hence, as the lands were exempt while held in trust by the state, the exemption continued while they were held by the railroad company as agent of the state. In support of this position we are referred to section 8 of the act of May 5, 1864, granting to the state the lands in question, which provided "that the said lands hereby granted shall, when patented as provided in section 7 of this act, be subject to the disposal of the companies respectively entitled thereto for the purposes aforesaid, and *no other*."

We are also referred to section 10, art. VIII of the constitution of this state, declaring, among other things, that "whenever grants of land or other property shall have been made to the state, especially dedicated by the grant to particular works of internal improvement, the state may carry on such particular works, and shall devote thereto the avails of such grants, and may pledge or appropriate the revenues derived from such works in aid of their completion." The seventh section of the

grant referred to, among other things provided, "that whenever the companies to which this grant is made, or to which the same may be transferred, shall have completed twenty consecutive miles of any portion of said railroads, . . . patents shall issue conveying the right and title to said lands to the said company entitled thereto, on each side of the road, so far as the same is completed, and coterminous with said completed section, not exceeding the amount aforesaid, and patents shall in like manner issue as each twenty miles of said road is completed." There is no dispute but that the lands in question had, prior to the levying of the taxes in question, been earned by the plaintiff by fully completing the requisite portion of its road, and that patents had been issued to the plaintiff, as required, thereby conveying to it the right and title to the lands in question.

The case of the *Railroad Co. v. Peniston*, 18 Wall., 5, involved the power of Lincoln county, Nebraska, to levy a tax upon the road-bed, depots, wood stations, water stations, and other realty and personal property of the Union Pacific Railroad Company, which had previously been chartered by the United States, and in which many important rights and privileges had been reserved to the United States; and the majority of the court held that, as congress had not prohibited taxation by the state, it had the power to tax the property of the corporation, as distinguished from its franchises. STRONG, J., giving the opinion of the majority of the court, said: "That the taxing power of a state is one of its attributes of sovereignty; that it exists independently of the constitution of the United States, and underived from that instrument; and that it may be exercised to an unlimited extent upon all property, trades, business and avocations existing or carried on within the territorial boundaries of the state, except so far as it has been surrendered to the federal government, either expressly or by necessary implication,— are propositions that have often been asserted by this court." Page 29.

The case of *Tucker v. Ferguson*, 22 Wall., 527, was a bill filed by the trustees of the bondholders to restrain the assessment of taxes at any time on the lands granted by congress to Michigan by the act of June 3, 1856, being similar to the grant in question, and which lands the state had, in a qualified way, granted to a railroad company to aid in constructing its proposed road, during the term allowed for the completion of the road. The company, not being able to "*sell*" the lands in the manner contemplated by congress before the road was made through them, issued its bonds and mortgaged the lands to trustees, which mortgage contained a clause empowering the trustees to *sell* the lands so mortgaged, and to apply the proceeds to the payment of the bonds thereby secured, and the court "*held*, upon this part of the case, that the lands had been *sold* within the meaning of the act of congress; and that, though the state, while she held the title as trustee of the United States, could not tax them, she now could do so." SWAYNE, J., delivering the opinion of the court, said: "It is a conclusive answer to the proposition we are considering, that the United States have no more claim, legal or equitable, touching the lands here in question, than they have to lands which they have sold and patented to others in the regular course of the administration of the land department of the government, and that congress has not seen fit, either expressly or by implication, to impose any restriction upon the taxing power of the state. That subject was remitted, as, under the circumstances, it might well be, wholly to her wisdom and discretion. . . . The state did not in any wise abdicate her sovereignty by accepting the trust, but the former might be exercised to render more effectual the discharge of the latter. She was in no wise fettered, except as she had agreed to fulfill all the terms and conditions which accompanied the grant. . . . Upon general principles, she could not tax the land while the title remained in the United States, nor while she held them as trustee of the United States, which, in view of the law, was

JANUARY TERM, 1881. 55

The Wisconsin Central Railroad Co. vs. Taylor County and others.

the same thing. But when the state, proceeding in the execution of the trust, had transferred her entire title to the company, and *they had perfected their title and acquired the right to sell*, the case assumed a very different aspect." Pages 571, 572.

The case of *Railway Co. v. Prescott*, 16 Wall., 603, was a bill filed in the state court of Kansas to restrain the assessment of taxes upon, and the collection of taxes from, lands granted to the Kansas Pacific, but which bill was dismissed by the trial court and the decision affirmed on appeal to the supreme court of that state, and then brought to the supreme court of the United States on writ of error; and MILLER, J., among other things, said that "while we recognize the doctrine heretofore laid down before this court, that lands sold by the United States may be taxed before they have parted with the legal title by issuing a patent, it is to be understood as applicable to cases where the *right* to the patent is complete and the equitable title is fully vested in the party, without anything more to be paid or any act to be done going to the foundation of his right." Page 608.

The case of *Railway Co. v. McShane*, 22 Wall., 444, was a bill in equity to restrain the collection of taxes assessed upon lands belonging to the Union Pacific in Nebraska, and the court below dismissed the bill as to all lands patented to the company, but granted the injunction as to the lands not patented to the company, and held that—" (1) *The Railway Co. v. Prescott*, 16 Wall., 603, is modified and overruled so far as it asserts the contingent right of preëmption in lands granted to the Pacific Railway Company to constitute an exemption of those lands from state taxation; (2) but affirmed, so far as it holds that lands on which the costs of survey have not been paid, and for which the United States have not issued a patent to the company, are exempt from state taxation. (3) Where, however, the government has *issued the patent*, the lands are taxable, whether the payment of those costs has been made to the United States or not."

In *Ross v. Outagamie Co.*, 12 Wis., 29, it was held that the purchasers of lands granted for the improvement of the Fox and Wisconsin rivers were taxable, notwithstanding no patents had been procured therefor from the general government. In the *West Wis. Railway Co. v. Trempealeau Co.*, 35 Wis., 258, which arose under the same grant we are here considering, it was held, among other things, that " the fact that the lands in question were granted by congress, subject to the disposal of the state legislature, to aid in the construction of the railroad described in the act, and for no other purpose, does not deprive the legislature of the power to tax them after they have been earned by, and become the property of, the railroad company." In that case the present chief justice, among other things, said:. " The state may doubtless relinquish its right to tax in a particular case, but it is well settled that an abandonment of this right is never presumed. As fast as the company acquired the title by the construction of the road, the trust was, *pro tanto*, executed. The right to tax existed as soon as the ownership of the lands was changed and they became private property. They then became liable to taxation and other burdens, equally with the lands belonging to natural persons." This was so held, notwithstanding the acceptance by the state of the grant subject to the conditions therein contained, and its consent to execute the trust thereby created, pursuant in all things to the terms, limitations and conditions of said act. That case was affirmed on writ of error from the supreme court of the United States. 93 U. S., 595. But this court in that case went still further, and declared, in effect, that, under the reserved power in our state constitution, the legislature might withdraw exemptions previously granted, even as to lands patented to the railroad in pursuance of this same grant of May 5, 1864. See, also, *Thomson v. Pacific Railroad*, 9 Wall., 579; *People v. Shearer*, 30 Cal., 645; *People v. C. P. Railroad Co.*, 43 Cal., 398; *Carrol v. Perry*, 4 McLean, 25; *Carroll v. Safford*, 3 How., 441; *Witherspoon v. Duncan*, 4 Wall., 210.

It follows as a natural sequence from the authorities cited, that as fast as any of the lands in question were earned by the plaintiff by the completion of its road, and became patented to it, they thereby became relieved of the trust and burden implied in the grant. Thereafter they were held by the company under the patents, with the same right of absolute disposition as lands held by individuals under patents by purchase from the general government. The title and ownership of the lands having passed, not only beyond the control of the United States, but also beyond the control of the state, they must, like all other private property, be subject to such burdens of government as the state, subject to constitutional limitations, may in its wisdom and discretion impose upon them.

But counsel insist that the acts of the legislature purporting to exempt the lands in question from taxation were in violation of section 1, art. VIII of the constitution of this state, which declares that "the rule of taxation shall be uniform, and taxes shall be levied upon such property as the legislature shall prescribe." The importance of the question suggested cannot be overrated. It is fundamental. It strikes at the very source of power in the raising of revenue. It reaches beyond the property in question, and touches all property and rights of property to which any legislative discrimination in the assessment and collection of taxes has been or may at any time in the future be applied. It is confined to no particular class of property, but may be made applicable to any. It is confined to no county, but will, in one form or another, reach every county within the commonwealth. It is confined to no class of citizens or corporations, but may be made applicable to any or all. It involves the question whether the legislature has any, and, if so, what discretion on the subjects of taxation. It is not a question of the abuse of power, but of the existence of power. It is not whether the power is restricted too much or too little by the constitution, but just how far the legislature has the power to prescribe the property upon which taxes

are to be levied. This is the question which squarely confronts us. We have been urged with great ability to give the section such construction as to forever prevent unjust discrimination by the legislature; and grave consequences have been assumed as the result of a different construction. On the other hand, we have been urged with equal ability that such a decision would unseat many titles, stop revenue, necessitate an immediate revision of the laws of taxation, and possibly the calling of a constitutional convention. The answer to all this is obvious. It is no part of the duty of the court to make or unmake, but simply to construe this provision of the constitution. All questions of policy; all questions of restriction and unjust discrimination; all questions of flexibility and adjustability to meet the varied wants and necessities of the people — must be regarded as having been fully considered and conclusively determined by the adoption of the constitution. The oath of all is to support it as it is, and not as it might have been. To do so may, in some cases, lead to individual hardships; but to do otherwise would be most potentous with evil.

The real question, then, is: What words are employed? What command do they utter? In other words, it is the plain duty of the court to find out, if possible, the extent of the inhibition upon the legislature in prescribing the property which shall be subject to taxation, and then, in the light of the authorities, proclaim it. With such grave considerations, and consequences so vast and enduring, it is well to move slowly and, if possible, with fixed sandals, and upon no slippery pathway. The difficulty which confronts us is not a lack of decisions in this court on the subject, but rather a departure, not only in principle and theory but in fact, by the majority of a divided court, from a decision made by a united court in 1855, and then a subsequent return by such majority to the former decision, with the announcement that their opinions were unchanged as to the principles and theory

of the law; and hence such opinions continued to impregnate other decisions with statements in conflict with the import of the first decision. In view of such departure, it may be well to examine the clause of the constitution in question, in the light of its history, before examining it in the light of adjudged cases.

In the earlier constitutions of the several states there were no express limitations upon the powers of the legislature over the subjects of taxation. The same is true of several at the present time. Bearing in mind a rule of construing a state constitution, often asserted by this and other courts, that such constitution is not, like the constitution of the United States, a grant of power, but rather a limitation upon the powers of the state legislature, and that it is competent for the state legislature to exercise all legislative power not forbidden by the constitution of the state or of the United States, nor delegated to the general government, it follows that all such state constitutions, which contained no such limitation upon the subject of taxation, left the legislature with plenary power over the question, subject only to the grants and limitations contained in the national constitution.

Under the British constitution, no act of the sovereign could be styled unconstitutional unless it was inconsistent with some principle or maxim which the supreme government had expressly adopted or habitually observed, and which was conformable to the general opinion and sentiments of the community, which were shocked by the act complained of. 1 Austin, 249. And, again: " As against the monarch, properly so called, or as against the sovereign body in its collective and sovereign capacity, the so-called laws which determine the constitution of the state, the ends or modes to and in which the sovereign powers shall be exercised, are not properly positive laws, but are laws set by general opinion, or merely ethical maxims, which the sovereign spontaneously observes." 2 Austin, 1018. In this country the people have not left the law-

making power to the spontaneous observance of "ethical maxims," but have, by written constitutions, rightly fixed limits for each department of the several state governments, beyond which they cannot go. While the law-making power in each, however, does not transcend the limits so fixed, nor interfere with the powers granted to the general government, its discretion as to matters committed to it is just as absolute as that of the British parliament. In those states, therefore, where there was an absence of any constitutional restriction on the subject of taxation, the legislative power over it was absolute, provided there was no infringement of federal authority. Remembering the extreme diligence with which wealth is often sought, and the means frequently resorted to, under the cover of law, to obtain it, the wisdom of such unrestricted power may be seriously questioned, as it leaves the people to be reconciled to discriminations in taxation only by what Chief Justice MARSHALL termed "the magic of the word 'confidence.'" 4 Wheat., 431.

The constitution of Tennessee, adopted in 1796, seems to have been the first to expressly limit the power of the legislature on the subject of taxation. Section 26, art. I, declared: "All lands liable to taxation in this state, held by deed, grant or entry, shall be taxed equal and uniform," etc. In 1834 it was slightly changed, and section 2, art. II, declared: "All property shall be taxed according to its value; that value to be ascertained in such manner as the legislature shall direct, so that the same shall be equal and uniform throughout the state. No one species of property from which a tax may be collected, shall be taxed higher than any other species of property of equal value." Section 20, art. VIII of the constitution of Illinois, adopted in 1818, provided that "the mode of levying a tax shall be by valuation, so that every person shall pay a tax in proportion to the value of the property he or she has in his or her possession." The same was continued in the constitutions subsequently adopted in that state. In 1819, section

8, art. VI of the constitution of Alabama, declared that "all lands liable to taxation in this state shall be taxed in proportion to their value." In 1820, section 8, art. IX of the constitution of Maine, declared that "all taxes upon real estate, assessed by authority of this state, shall be apportioned and assessed equally, according to the just value thereof." In 1820, section 19, art. III of the constitution of Missouri, declared "that all property subject to taxation in this state shall be taxed in proportion to its value."

Sections 1 and 2, "Revenue," art. VII of the constitution of Arkansas, adopted in 1836, declared that "all revenue shall be raised by taxation, to be fixed by law. All property subject to taxation shall be taxed according to its value, that value to be ascertained in such manner as the general assembly shall direct, making the same equal and uniform throughout the state. No one species of property from which a tax may be collected shall be taxed higher than another species of property of equal value." In 1838, section 1, art. VIII of the constitution of Florida, declared that "the general assembly shall devise and adopt a system of revenue, having regard to an equal and uniform mode of taxation, to be general throughout the state." In 1845, article 127 of title VI of the constitution of Louisiana declared that "taxation shall be equal and uniform throughout the state. After 1848, all property on which taxes may be levied in this state shall be taxed in proportion to its value, to be ascertained as directed by law. No one species of property shall be taxed higher than another species of property of equal value, on which taxes shall be levied." In 1845, section 27, art. VII of the constitution of Texas, declared that "taxation shall be equal and uniform throughout the state. All property in this state shall be taxed in proportion to its value, to be ascertained as directed by law, except" exemptions. In 1846, section 6, art. I of the constitution of Iowa, declared that "all laws of a general nature shall have a uniform operation. The general assembly shall not grant to any

citizen or class of citizens privileges or immunities which, upon the same terms, shall not equally belong to all citizens." And section 30, art. III, declared that "the general assembly shall not pass local or special laws . . for the assessment and collection of taxes for state, county or road purposes; . . and in all . . cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the state."

Thus it appears that, prior to the adoption of our state constitution, ten states had each undertaken, by its constitution, to limit the powers of its legislature on the subject of taxation. The other states then forming the Union were at that time without inhibitions on the subject. Our constitutional convention contained many able men, and several able lawyers. In the important work of devising and adopting a constitution, we must assume that they carefully examined the constitutions of the several states, especially upon so important a subject as that of taxation. To do otherwise would have been a dereliction of duty that no one who is acquainted with the men would think of for a moment. If our statement is correct, then they found, on examination, that nineteen states were without restriction on the subject, and ten with restriction. Of the ten constitutions containing restrictions, four do not contain the word "uniform," which is the controlling word in the section of our constitution. Six do contain the word "uniform," but in each case it is coupled with terms of equality, universality and valuation, or some of them, and with exceptions as to the exemption of certain designated property. In Tennessee and Arkansas, it seems, they were unwilling to risk the limitation on the value being "equal and uniform," but added terms of universality, and that no "one species of property . . . shall be taxed higher than another species of property of equal value." So, in Louisiana, being unwilling to risk the limitation on the words "taxation shall be equal and uniform," they added that, after 1848, prop-

erty should be taxed in proportion to its value, and that no one species of property should be taxed higher than another of equal value. The import of the provision in the Iowa constitution was the nearest approach to the one adopted in this state, but the phraseology used was very different. The question of prohibiting all exemptions and authorizing certain exemptions was brought prominently before the convention, and after discussion to the effect that the naming of certain exemptions would, impliedly, prohibit the legislature from granting any others, the convention refused to specifically name the property to be exempted. So an amendment was proposed in these words: " Section 1. All taxes levied in this state shall be uniform and equal, and shall be assessed upon a just valuation of real and personal property." But the amendment, with another section relating to exemptions, was voted down. This proposed section, so voted down, was almost identical with a portion of the sections then existing in the constitutions of Tennessee, Arkansas, Louisiana and Texas; but in Tennessee, Arkansas and Louisiana it had an additional feature.

The section originally proposed in our convention was: "Section 1. All taxes levied in this state shall be as *nearly equal* as may be;" with another section covering exemptions. But finally the latter section was stricken out, and on motion of Edward V. Whiton, then a delegate in the convention, and afterwards chief justice of this court, the first section was amended by adding the words, " and shall be levied upon such property as the legislature shall prescribe;" and subsequently, after much discussion, and after various proposed amendments had been voted down, on motion of Mr. Whiton the first part of the proposed section was stricken out, and in lieu thereof there was inserted the words, " the rule of taxation shall be uniform throughout this state;" so that Judge Whiton was really the author of what is, substantially, the section as it now stands. It would appear, from the debates in the convention, that some were in favor of binding the legislature firmly both as to tax-

ation and exemptions, while there were others who favored flexibility as to both. The result was a compromise, and the adoption of the unique expression upon the subject found in our fundamental law. Possibly it would have been better for the people at large, had the constitution, in addition to a uniform rule of taxation, required an equality of valuations and assessments, and prohibited all discriminations, by provisions similar to those which then existed in some of the constitutions to which we have referred. But it is to be remembered that the embryo state contained but few people at the time, scattered over a broad extent of territory, with resources undeveloped, purposes unfixed, industries undetermined, capital largely borrowed, credit unestablished, profits uncertain and in many cases purely speculative; and hence the refusal, after calm consideration, to adopt the rigid limitations found in some of the constitutions named. Besides, if we mistake not, none of the original thirteen states had at that time any such constitutional restriction, nor had Ohio, Indiana or Michigan; and hence the men who composed the convention were mostly from the states having no such limitation — a fact naturally creating a bias in their minds against it.

Profiting by the light of this history, and the evident circumstances attending the deliberations of the convention, let us seek such further aid as we may be able, from a careful consideration of the juridical discussions which followed, to the end that we may, if possible, ascertain the exact extent of the limitation imposed by the section. The first case which came before this court, involving the question, was the *M. & M. R. R. Co. v. Board of Sup'rs of the County of Waukesha.* That was a bill in equity to restrain the supervisors and certain officers from collecting a tax levied and assessed for the year 1854 upon the road, track, depot and fixtures of the complainant, located in and through the town of Eagle, valued at several thousand dollars, and which tax was levied for town, county, state and school-district purposes,

and the fees of officers for collecting the same. The *gravamen* of the bill was that, under and by virtue of an act entitled " An act taxing railroads and plankroads," approved April 1, 1854, it had been made the duty of the railroad company to pay to the treasurer of the state, for the use of the state, on or before January 10th in each year, a sum equal to one per centum on the gross earnings of their road, and which, by the terms of the act, was declared to be " in lieu of and in full of all the taxes of every name and kind upon the road or other property belonging to the complainants." And the bill further alleged that the act provided that it should " not be lawful to levy or assess thereupon any other or further assessments or tax for any purpose whatever, and that at the time of the levying and assessing of the tax the said act was in full force, and was then still in force, and that therefore the tax so levied and assessed was without authority in law, illegal, and absolutely void, and prayed that the same might be so decreed, and for an injunction accordingly." March 16, 1855, the defendants demurred, principally upon the grounds that there was no equity in the bill; that the act of April 1, 1854, was unconstitutional; and that the taxes so levied under the general law were properly and legally assessed. June 11, 1855, that learned circuit judge, Levi Hubbell, overruled the demurrer, and gave his reasons therefor at length. Among other things he said:

"The defendants contend that under the law in question 'the rule of taxation' is *not* uniform: (1) Because it establishes a rule of taxation for property belonging to companies mentioned, differing from the general rule applicable to the taxation of other property — it being a tax upon income instead of a ratable tax upon value; (2) because it levies a state tax, and exempts from town, county and district taxes; (3) because it establishes a new mode of levying taxes, differing from the general rule. . . . I am compelled to dissent from all the positions taken by the defendants. Their error arises in part,

I apprehend, from looking at the first clause of the section quoted, without due regard to the remainder. The last clause qualifies and controls the first: ' Taxes shall be levied upon such property as the legislature shall prescribe.'· No property can be lawfully taxed until the legislature authorizes and requires it to be done; and, of course, no property can be taxed when the legislature prohibits its being done. The legislature is vested with the absolute power of declaring what property throughout the state shall be, and what shall not be, subject to taxation. This power has been variously exercised from the first organization of the state government, and almost every legislature has restricted or extended the quantity or character of property coming within the rule. Large amounts of both real and personal property have been wholly exempted from taxation." 9 Wis., 434. After naming many species of property which had been so exempted, he adds: " All this has been wholly exempted. This exercise of power on the part of the legislature has not, to my knowledge, been questioned, and there is no doubt that to this long list the legislature might have added the property of all railroad and plankroad companies. And, if it might exempt wholly, why not in part? The major power includes the minor. A general power to pardon includes the right to annex conditions and to grant reprieves. I see no reason why, upon this principle, the law in question, which operates as a partial exemption from general taxation, may not be valid. Regarding the annual payment to the state as a tax, as the defendants claim, why might not the legislature grant exemption in all other respects? The law certainly is not void because it is not worse, and does not confer greater privileges upon these companies, to wit, total exemption. But I regard the payment to the state, not as a tax, but as a *bonus* or compensation for the exemption granted. The whole substance and effect of the law is to release those companies absolutely from all ordinary taxes for ordinary purposes upon the condition of an annual payment

to the state." Pages 434–5. "Now, the legislature, having full power to grant the privilege of exemption to those companies, has done it upon its own terms — that of paying to the state a portion of their annual income; and I see no ground of principle upon which to deny the power, or to question its rightful exercise. But, allowing to the defendants the benefit of their own premises in their broadest scope, I am still forced to the same conclusion." Page 435. "Under every view which I have been able to take of this case, I cannot but regard the act of April 1, 1854 (whether its provisions be wise and equal or otherwise), as within the constitutional power of the legislature, and therefore valid." Page 436.

From this decision of Judge HUBBELL, overruling the demurrer, the defendants immediately took an appeal, and the same came on for argument in this court, July 20, 1855. The records of this court show that the argument consumed six consecutive days. With such exhaustive arguments, by most eminent counsel, the members of the court must have been thoroughly aroused to the importance of the questions involved, and hence must have fully deliberated thereon before coming to a conclusion. On this bench, at the time, sat Chief Justice WHITON, the acknowledged leader in the constitutional convention, and the author of the very section of the constitution under consideration. Upon one side of him was Judge A. D. SMITH, whose ability has never been questioned, and whose learning in the law and liberal culture has been much admired; while upon the other side was the present chief justice, who had just taken his seat upon the bench, but who was also a colleague of Chief Justice WHITON in that constitutional convention, taking part in all the discussions, deliberations and votes pertaining to the adoption of this very section. With a court composed of such judges, after such discussions, and upon such a question, it would seem almost impossible that there should be any mistake in the conclusion reached. The records of the court show that the decision was not announced

until November 17, 1855, nearly four months after the argument, and then simply to the effect that the order overruling the demurrer to the bill was affirmed. That decision, by a united court, however, like the decision of Judge Hubbell, appealed from, was necessarily adverse to each and every point raised by the demurrer. By that decision, this court, among other things, necessarily held that by the act mentioned the legislature had exempted all property of the railroad from any and all taxation for county, town and school purposes, and that such exemption was constitutional and valid; and had also exempted all such property from all taxes for state purposes, and from all other taxes of every name and kind, on the basis of valuation, as taxes on other property were assessed and collected by general laws, and, in lieu thereof, required the railroad company, under said act, to pay to the treasurer of the state, for the use of the state, on or before January 10th of each year, a sum equal to one per centum on the *gross earnings* of their road; and that such exemption and discrimination were constitutional and valid.

It is true that no opinion was ever written giving the reasons for the conclusions so reached by the court; but the decision so necessarily made became thereupon just as binding upon the court, and as a rule of construction, as though the opinion had been voluminous. The writing of the opinion of the court fell to the lot of Judge Smith, and it appears from the records of the court that the papers in the case were in fact retained nearly fifteen months after the decision was announced, apparently for the purpose of enabling him to write the opinion before they were remitted, but which he finally failed to do, except to file his own mere memoranda, found in 9 Wis., 449. The present chief justice has more than once attested to the great care and deliberation of the court in reaching the conclusions in that case (9 Wis., 427; 11 Wis., 47); and we may add that he has often expressed his deep regret that the full, clear and logical oral opinion expressed by Chief Justice

WHITTON, while the case was under consideration, had not been reduced to writing and filed in the case for the guidance of all.

The case of *Knowlton v. Sup'rs of Rock Co.*, 9 Wis., 410, came before this court at the first term after Judges DIXON and PAINE came upon the bench; and the question there involved was, whether the provision in the charter of Janesville, which provided that lands within the city limits "used, occupied or reserved for agricultural or horticultural purposes," should not pay a tax exceeding one-half as much on a dollar as lands lying within recorded plats in said city; and it was there held by Judges DIXON and PAINE that such discrimination was unconstitutional and void. The opinion of the majority of the court was written by Judge DIXON, and is quite lengthy, but refers to no adjudged case except *Milwaukee & Mississippi R. R. Co. v. Board of Sup'rs of the County of Waukesha*, referred to, and the same was overruled by himself and Judge PAINE, or rather treated by them as being of no binding force as a decision of the court, for the apparent reason that no opinion had been written and filed in the case, and that the case had never been reported. The present chief justice, however, dissented from that decision, and reiterated and followed *Milwaukee & Mississippi R. R. Co. v. Waukesha Co.*, and maintained that, within the principles of that decision, it would have been competent for the legislature to have provided that the farming and garden lands within the limits of the city of Janesville might have been subject to a different rule of taxation for city purposes than the other real estate therein situated. Page 428. And he adds:

"The division of property into real, personal and mixed, we consider a mere arbitrary division, which the legislature might or might not regard in the imposition of taxes. The legislature might adopt other classifications of property, imposing the tax upon those various classifications or kinds of property, and the rule of uniformity would be preserved." Page 428. "The legislature could prescribe the property upon which taxes were

to be levied, and the constitution required that the rule should
be uniform upon that property." Page 429. "In prescribing
the rule of taxation, I do not think the framers of the consti-
tution were proceeding upon the idea that all property should
be subject to taxation, and that a tax should be equal and uni-
form according to value of property; for if they had so intended
they would have incorporated a provision designed to accom-
plish that result, as had been done" in Louisiana and other
states, as above mentioned.

In *Weeks v. Milwaukee*, 10 Wis., 242, PAINE, J., approv-
ingly quotes the remark of BARTLEY, C. J., in *Exchange Bank
v. Hines*, 3 Ohio St., 15, that "uniformity in taxation implies
equality in the burden of taxation;" but the learned justice
failed to note that BARTLEY, C. J., was construing a section in
the Ohio constitution adopted three years after the constitu-
tion of this state was adopted, and which, instead of following
the language of our constitution, read as follows: " Laws shall
be passed taxing by a uniform rule *all* moneys, credits, invest-
ments in bonds, stocks, joint-stock companies, or otherwise, and
also *all* real and personal property, *according to its true value
in money*," except certain exemptions named. And so it ap-
pears that BARTLEY, C. J., was construing a constitution con-
taining an important provision taken from constitutions which
our convention in substance refused to adopt; and hence he
said: "This provision requires *all property* of every description
in the state to be taxed by a *uniform rule*, and *at its true value
in money*, with the exception of certain enumerated exemp-
tions." Page 13. The italics are in the original. Under such
a provision there would be no difficulty in holding that all
property of every description in the state must be taxed at its
true value in money by a uniform rule, and hence the burden
of taxation would necessarily be equal. But the legislature of
Wisconsin were never under any such constitutional restriction,
and the people, in constitutional convention, expressly refused
to so limit the legislative power.

*Lumsden v. Cross*, 10 Wis., 282, involved the validity of certain assessments for improvements in front of certain lots in Milwaukee, and was properly held to come under section 3, art. XI of our state constitution, and not under section 1, art. VIII, which we are considering; and hence what was there said by DIXON, C. J., by way of reiterating what he and Justice PAINE held in *Knowlton v. Rock County*, was necessarily *obiter*. He there said: "The constitution of Ohio, in relation to the general rule of taxation, is in effect the same as our own. If there be any difference, it is the more stringent of the two." Page 285. But instead of being in effect "the same as our own," or simply "more stringent," they are essentially different in language and meaning, as we have already shown. The Ohio constitution not only required that taxation should be "by a uniform rule," as our constitution does, but left no discretion to the legislature as to prescribing the property which should be taxed. It required that "all" the property *named in their constitution*, instead of such as *might be named* by the legislature, should be taxed "according to its true value in money."

The *State ex rel. Att'y Gen. v. Plankroad Co.*, 11 Wis., 35, was an application for a *mandamus* to compel payment to the state, in lieu of all taxes, under the same act of the legislature which the plaintiff company claimed exempted its property in the *Milwaukee & Mississippi Railroad Company v. Waukesha Co.*, where the act was declared to be constitutional and valid by a united court; but Judges PAINE and DIXON sustained a motion to quash, on the ground that the same act was unconstitutional and void. PAINE, J., writing the opinion of himself and DIXON, C. J., reiterates the position which they took in *Knowlton v. Rock County*, six months before, including the excuse there given for overriding, or rather ignoring, the solemn decision made by this court in 1855. He then urges the inapplicability of that line of decisions holding that that clause of the federal constitution requiring uniform-

ity of duties, imposts, etc., throughout the United States, did not prevent discrimination between different kinds of property; and then virtually rests the case upon a single clause of the opinion of the court in the *Exchange Bank of Columbus v. Hines*, 3 Ohio St., 1, which, as we have already stated, was under a constitutional provision adopted in that state three years after ours, and was taken substantially from provisions in other state constitutions, which our constitutional convention expressly rejected; and particular stress was laid upon the provisions of their constitution not found in ours. The difference between the provision of our constitution and that of Ohio seems to be broader than that between Ohio and Iowa, and yet the supreme court of the latter state, in comparing the two, said " that the difference between the clause of the constitution of Iowa, relied upon, and the clause of the Ohio constitution upon which the supreme court of Ohio based its decision in the case of the *Exchange Bank v. Hines, supra*, is so essential that the correctness of that decision might well be conceded without at all involving the necessity of holding that section 722 of the revision is in conflict with our constitution." *Macklot v. City of Davenport*, 17 Iowa, 383. But even Justice PAINE admitted in that case, that " the same provision says that 'taxes shall be levied on such property as the legislature shall prescribe;' and this necessarily implies that they may exempt from taxation such property as they see fit. It cannot be denied that, under this power of exemption, unjust enactments in respect to taxation might be made. But those who framed the constitution did not see fit to prevent such evils by depriving the legislature of the power." 11 Wis., 42.

But from the views of Judges PAINE and DIXON, declaring the statute involved in that case unconstitutional, the present chief justice squarely dissented, and reasserted the doctrine of the court as necessarily resulting from the decision in the *M. & M. R. R. Co. v. Waukesha Co.*, and his dissenting opinion

The Wisconsin Central Railroad Co. vs. Taylor County and others.

in *Knowlton v. Rock County*, and, among other things, made some healthy suggestions. He said that "it is quite clear that the decisions of this court upon doubtful questions of statutory and constitutional law will not inspire a very high degree of public confidence, if, as its members change, they shall feel at liberty to revise and overrule former adjudications upon such questions, which have been made after the fullest discussion and examination. I should therefore feel some reluctance, in view of the nature of the questions involved and of the circumstances of the case, in departing from a decision so well considered as that of the *M. & M. R. R. Co. v. Waukesha Co.*, even if subsequent reflection had raised some doubt in my mind as to the conclusions of the judgment in that case; for it is to be borne in mind that the legislature, in the recent revision of the statutes, retained the law of 1854 after it had been in operation some years, which would not have been done if the system of taxation therein established, when applied to plank and railroad companies, had been considered unjust and unfair by the people of the state. Besides, as a practical measure, it may be found difficult to frame a law which subjects this kind of property to the same mode of assessment and taxation, in the various towns and counties, as are applied to other property, and which will not be liable to a great deal of fraud and injustice in its administration." Page 47. "I only propose making a few observations upon the construction given this section by the majority of the court. And it appears to me that the signal error of that construction is in supposing that the object and intent of the section were to secure equality in the burdens of taxation, and that its design was to prevent the legislature from discriminating between the different kinds or classes of property in imposing taxes. It is very apparent that the section consists of two clauses, which essentially modify and control each other. The former clause should not be construed apart from the wide discretion given the legislature in the exercise of the taxing power as contained in the

second clause. The power of the legislature to discriminate between different classes of property is ample and unqualified in the latter clause." Pages 48–9.

But the conflict could not long be postponed. Either the fundamental theory of taxation which, under the constitution, had from time to time found its way into the statutes and laws of the state, was to be uprooted and forever overturned, and the result of the decision of the united court in *M. & M. R. R. Co. v. Waukesha Co.* forever repudiated, or else Judges DIXON and PAINE were to retrace their steps and yield to a construction which they had so vigorously repudiated.

At last *Kneeland v. Milwaukee*, 15 Wis., 454, came on for argument in the winter of 1862. The question made was, "whether the omission by the assessors in the city of Milwaukee to insert in the tax lists the large amounts of railroad property there, in pursuance of that law," which was declared constitutional in *M. & M. R. R. Co. v. Waukesha Co.*, and unconstitutional in *State ex rel. Attorney General v. Winnebago Lake and Fox River Plankroad Co.*, did "not invalidate the taxes imposed upon the other property." The consequences necessarily resulting from the decision of the majority of the court in the last case cited, had come to a practical test. PAINE, J., filed the leading opinion in *Kneeland v. Milwaukee*, March 15, 1862. The case had been argued by eminent counsel. Justice PAINE, among other things, said, we have been "strongly urged by counsel . . . to review our decision overruling the former decision of this court, and, retracing our steps, hold the law taxing railroads to have been constitutional. I confess I have had great doubts, in view of the possible results of a consistent adherence to our last decision, whether our duty does not require us to take this course. I freely admit that all these results were not foreseen by me. The case in which our decision was made, was made up by the parties for the purpose of testing the question how far the principle announced in the previous decision of *Knowlton v.*

*Rock Co. (supra)* would be applied to the validity of the law taxing rail and plank-roads. A speedy decision was desired and made, in order that the legislature then in session might take such action as might be deemed necessary. . . Had the invalidating of all those taxes been presented as one of the probable results of a change of decision, it would have added very greatly to the force which I then believed the maxim *stare decisis* was entitled to." Page 462. " But, if we go backward, we must say that particular classes of property may be taxed at less rates than others, and that the legislature may make whatever discrimination they please in the rates of taxation, provided only that each class is taxed alike." Page 463. " And, believing as I do that a return to a construction which virtually annuls its entire efficiency for that purpose, would be more disastrous than any inconvenience that would result from enforcing the obvious meaning of the instrument, I feel bound, for one, to stand upon our last decision." Pages 463–4.

Dixon, C. J., filed a separate opinion of concurrence at the same time, but neither of them cited any decision of any other court in support of their position, and seemingly took no note of the circumstances attending the adoption of section 1, art. VIII, and the intentional difference between it and the provisions of other constitutions. The present chief justice also filed a separate opinion at the same time, in which he conceded that the conclusions of Judges Paine and Dixon "logically and inevitably " followed from their former decisions, but declared that his own views had " remained unchanged." On a motion for a rehearing, which was granted, Dixon, C. J., filed an opinion June 2, 1862, and, among other things, said: " As to rail and plank-road property, I am almost, and I cannot say but fully, prepared to return to the rule of taxation said to have been established by this court in 1855. I am in great doubt and perplexity upon the subject. My views of the constitution remain unchanged. I never had, and never can have, any doubt about that." Page 467. " I make this full declaration of my views now and without waiting for further argu-

ment,.because of the urgent necessity for an immediate decision. The legislature is about to assemble, *convened on this very business,* and delay is impossible." Page 471. At the same time, PAINE, J., filed a concurring opinion, in which, among other things, he said: "I have become satisfied that, if we adhere to the decision already announced in this case, it will invalidate not only the taxes in those counties where there was rail and plank-road property, but also the entire taxes of the state; for the omission of that property in the counties where it was located necessarily disturbs the proportions as between them and the other counties in the state equalization." He then said, in effect, that the law of 1860, professing to exempt railroads entirely, and then requiring them to pay a license, was, in substance, the same thing as the law of 1854, under another name, and hence an adherence to their former opinion would also invalidate that; and then adds: "I have become fully convinced, therefore, that no court can be justified in adhering to a departure from a decision once made upon the construction of a constitutional provision, where such departure must uproot so extensively both the public and private business transactions of the state." Page 472.

January 13, 1863, PAINE, J., filed in the case the final determination of the court, affirming the decision of the court below dismissing the bill to restrain the collection of the taxes, instead of reversing the same, as in the first opinion filed nearly a year before. By this change, the decision made by Judges PAINE and DIXON in *State ex rel. Attorney General v. W. L. & F. R. P. R. Co.* was overruled, and the points necessarily decided by the affirmance of the order in *M. & M. R. R. Co. v. Waukesha Co.,* were followed, on the maxim *stare decisis.* Thus this court, at last, made the circuit, and the stone which the builders rejected again became the head of the corner. By that change, all its utterances inconsistent with the points so necessarily decided by the united court, November 17, 1855, became from thenceforth as mere *dicta.*

But is it quite clear that the decision in *M. & M. R. R. Co.*

*v. Waukesha Co.* was contrary to sound reason, and to be sustained only upon the maxim *stare decisis?* Under the provision of the constitution of Maine, quoted above, and which is more stringent than ours, as it required that taxes should be "apportioned and assessed *equally*, according to the just *value thereof*," it was held that "it is within the constitutional authority of the legislature to empower the city council of the city of Portland to exempt from taxation for a term of years, property belonging to the Portland Water Company, in consideration of an undertaking and agreement by the company to furnish, free of cost to the city, a supply of water for its public and municipal purposes." *Portland v. Portland Water Co.*, 67 Me., 135.

Under the provision of the constitution of Iowa, quoted above, it was held that, "under section 797 of the Code, all property, including the residences of professors upon the grounds of literary institutions, and the dwellings of clergymen owned by religious societies, and used exclusively for such dwellings, without income to the owners, which is proper and appropriate to effectuate the objects of the institutions or societies, is exempt from taxation;" and that such statute was constitutional, notwithstanding such discrimination was determined, not by the use of the dwelling-house, but by the business of the occupant. *Trustees of Griswold College v. Iowa*, 46 Iowa, 275.

In *C., B. & Q. R. R. Co. v. Iowa*, 94 U. S., 155, it was held that "the act of the general assembly of the state of Iowa entitled 'An act to establish reasonable maximum rates of charges for the transportation of freight and passengers on the different roads of this state,' is not in conflict with section 4, art. I of the constitution of Iowa, which provides that 'all laws of a general nature shall have a uniform operation,' and that 'the general assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens;' nor is it

a regulation interfering with commerce." WAITE, C. J., said: "The statute divides the railroads of the state into classes, according to business, and establishes a maximum of rates for each of the classes. It operates uniformly on each class, and this is all the constitution requires." Page 163.

Section 1, art. XI of the constitution of Kansas, adopted in 1859, provides that "the legislature shall provide for a uniform and equal *rate* of assessment and taxation." This section not only requires uniformity of *rate*, but *equality* of rate; but an act providing a different method of assessing and collecting taxes on railroad property than other property was held not to be unconstitutional. *M. R., Ft. S. & G. R. R. Co. v. Morris*, 7 Kan., 210. VALENTINE, J., said: "The constitution does not require that the manner or mode of assessing and taxing property, or the manner and mode of collecting the taxes, shall be equal and uniform, but simply requires that all property shall be assessed and taxed at an equal and uniform *rate*." By a parity of reasoning it may well be held, that a provision which simply limits the manner and mode, does not restrict the legislature as to the rate or valuation. In *Francis v. A., T. & S. F. R. R. Co.*, 19 Kan., 303, it was held that an act of the legislature of that state, which provided for the collection of state taxes directly through the machinery of the state government, on railroad property in the unorganized counties of the state, where no other property was taxed, was not in violation of the clause of their constitution, *supra*. BREWER, J., giving the opinion of the court, said: "It must be borne in mind that the constitution was designed as a permanent instrument; that it contemplated a state, all whose territory was inhabited; and, without descending into minute details, or covering every possible contingency, sought to prescribe general and enduring rules. It is no sliding scale, with varying provisions for vacant plains and uninhabited localities. A constitution is for citizens, not for prairies; for a community, and not for a desert. In the very nature of things, large dis-

cretion must be left to the legislature as to what provisions should be made for, and what obligations cast upon, those who push out beyond the limits of organized counties and commence the work of reclaiming the desert." Page 310. "It seems to be assumed by counsel that the legislature cannot legally exempt any property from taxation other than that expressly named in the constitution. Is this true? There is in terms no prohibition on such exemption; and, as to personal property, the language of the constitution seems to imply the existence of a power to exempt." Pages 311, 312. He then quotes the provisions of several constitutions, and adds: "In all these provisions will be noticed either an express direction to tax *all* property, or an express prohibition on exempting any other than certain specified property. Our constitution contains neither. Does it mean the same without as these do with? The positive language of these several sections sustains, if it does not compel, the positive assertions of the various decisions cited by counsel. Those decisions rest upon the clear commands and prohibitions of the constitution upon which they were based, and are therefore only of limited and qualified application here." Page 314.

If, under a more stringent constitutional provision than ours, as that of Kansas is, railroad property, and none other, could be lawfully taxed in certain counties of that state, there would seem to be nothing to prevent the legislature from exempting a portion of the property belonging to a railroad company, under a constitution that is entirely silent upon the subject of exemption.

Section 1, art. X of the constitution of Indiana, adopted in 1851, three years after ours, provides that " the general assembly shall provide by law for a uniform and *equal rate* of assessment and taxation; and shall prescribe such regulations as shall secure a just valuation for taxation of *all* property, both real and personal, excepting," etc. Under this provision, the court, in *L. & N. A. Railroad Co. v. McCarty*, 25 Ind., 180,

said: "The constitution does not require a uniform method of valuation of property, but only such regulations as shall secure a just valuation for taxation of all property, both real and personal. The legislature must use a discretion as to the best method of securing a just valuation of property, and unless the method adopted be clearly inadequate to secure that result, we cannot question its action."

Under the constitutional provision of Louisiana, quoted above, which was far more stringent than ours, it was held that "the legislature has the power under the constitution to commute the taxes imposed on a corporation created by it, and thereby to relieve it from the payment of all other licenses or taxes by the state itself, or by any municipality created and authorized by the legislature to levy a license or tax on such corporation. The exemption of the lottery company in its charter from the payment of all other taxes and licenses, on its payment annually into the state treasury of a certain amount for the benefit of the school fund, is not, therefore, in conflict with article 118 of the constitution." *La. St. Lottery Co. v. New Orleans*, 24 La. An., 86. In *New Orleans v. Kaufman*, 29 La. An., 283, it was held that "the constitutional provision that taxes shall be *equal* and uniform does not prevent the legislature, or any municipal corporation authorized thereto by the legislature, from dividing the objects of taxation into different classes, and imposing different taxes on each class. It merely requires that the tax on each member of the same class shall be the same." Under the constitutional provision of Missouri, above quoted, it was held, as early as 1851, that "the act of 1849 (in that state), which purports to establish a system of taxation upon merchants and grocers, 'in lieu' of other enactments then existing, is not of itself such a departure from the bases of taxation ordained by the constitution, as to require the interposition of the judiciary." That act was quite similar to the act in this state respecting rail and plank-road companies; but when we remem-

JANUARY TERM, 1881. 81

The Wisconsin Central Railroad Co. vs. Taylor County and others.

ber that their constitution required that all property should be taxed in proportion to its value, the decision would seem to go much further than the *Waukesha Case*.

Section 11, art. XIV of the constitution of Michigan, adopted in 1850, two years after ours, provided that " the legislature shall provide a uniform rule of taxation, except on property paying specific taxes, and taxes shall be levied on such property as shall be prescribed by law.". Section 12, art. XIV: " All assessments hereafter authorized shall be on property at its cash value." Section 11 contains the substance of ours, with an exception; and section 12 provides in addition, what ours does not, that " *all assessments* shall be on property at its *cash value.*"

The first reported case under those sections was *Williams v. Detroit*, 2 Mich., 560, decided in 1853, in which GREEN, J., said that " it is insisted that the assessment in question was not made under any uniform rule of taxation provided by the legislature, and that it was therefore void. It is not now necessary to determine what is the true import of the first clause of this (twelfth) section. No new rule of taxation had been provided by the legislature when the assessment was made, and it is not pretended that this provision of the constitution executes itself. Until the legislature shall have established a rule of taxation in conformity to this requirement, it cannot be known what that rule is. . . The term ' assessment,' as sometimes used, denotes the valuation of property by the assessors for the purposes of taxation, and it is sometimes used to denote the levying of a tax upon property or persons. In this (twelfth) section it seems to have reference to the valuation, and not to the levying of a tax. The assessment complained of, however, if authorized at all, was so authorized by a law enacted long prior to the taking effect of the constitution, and was not authorized by any law enacted after that time." Page 365.

The next case which came before that court under that pro-

vision, was *The People v. The Auditor,* 7 Mich., 84, decided
in 1859, cited upon the argument.  That arose under an act of
the legislature of that state, passed in 1853, remitting certain
taxes for the term of five years to the contractors of a ship
canal under a land grant similar to the one in question.  MAR-
TIN, C. J., giving the leading opinion of the court, said: "In
making this contract the state acted as the trustee of the gen-
eral government; in the law authorizing the contract it was
dealing with the subject of the trust, over which no right of
taxation then existed.  But, were this otherwise, I do not re-
gard this remission of the taxes as a violation of that provis-
ion of article XIV of the constitution which requires the
legislature to provide a uniform rule of taxation except on
property paying specific taxes.  This provision of the consti-
tution has *no reference* to the power to *exempt* or to remit
taxes; which is, and necessarily must be, to a great extent, left
to the discretion of the legislature. . . The legislature has
the power of prescribing the subjects of taxation and of
exemption, but it cannot arbitrarily tax property according to
locality, kind or quality without regard to value, but in this
respect it must act by uniform rule.  But to exempt property,
as is done in the case of church, school or library property, or
to remit taxes for any cause, *has nothing to do* with the uni-
formity of the rule of taxation."  Pages 90–1.  MANNING, J.,
said *inter alia:* "There is nothing in the constitution in ex-
press terms inhibiting the enactment of the law by the legis-
lature. . . The two sections, taken together, mean that all
descriptions of property *subject to taxation* shall pay such pro-
portion of a tax as their cash value bears to the aggregate cash
value of the whole property *subject to the tax.*"  Pages 96–7.
He then goes on to sustain the act, "because the tax was not
remitted as a favor," but "in pursuance of a contract between
the state and relators," and then adds: "It was competent for
the legislature to have *exempted* the lands from taxation for
the five years."  Page 98.  CHRISTIANCY, J., agreed in the re-

sult of the decision " as to the constitutionality of the law." CAMPBELL, J., agreed that there was "no constitutional objection to the act under which the lands of the relators" were "exempted from taxation." Page 102.

*Youngblood v. Sexton*, 32 Mich., 406, was a bill in equity to restrain the collection of a tax under the act passed in 1875, and which imposed a tax of $150 per annum upon the business of selling spirituous liquors by retail, and $300 per annum upon the business of selling the same by wholesale; and of $40 per annum upon the business of selling fermented or brewed liquors by retail, and $100 per annum upon the business of selling the same by wholesale; and in which it was, among other things, urged by counsel that the act was in conflict with the provision of the constitution quoted. COOLEY, J., giving the opinion of the court on this point, said: " If the precise point here is that the tax is unequal and unjust because it is not levied in proportion to the business done, then the objection is without force. It may possibly be true that an apportionment according to the business done would have been more just, *but a question of this nature concerns the legislature, not us.* Courts cannot annul tax laws because of their operating unequally and unjustly. If they could, they might defeat all taxation whatsoever; for there never yet was a tax law that was not more or less unequal and unjust in its practical workings. . . . But the objection to want of uniformity is wholly misplaced here. Uniformity is the very basis of this tax. It is levied entirely without discrimination, and the real objection to it is, not that it lacks uniformity, but that the legislature were unjust in making it uniform, instead of levying it by some standard of discrimination. The objection presents a case of misapplication of terms. It is also presented to the wrong tribunal. The question whether a tax is just and equal or not, is not a question of law; and this will meet any objection to the law based upon the fact that other kinds of business are not similarly taxed. Apportion-

ment of taxation is purely a legislative function." Pages 414, 415.

If a tax of $150 per annum upon the business of every retail dealer in spirituous liquors, without regard to the amount of business done or capital invested, was by "a uniform rule of taxation," then it must be also uniform to tax every horse, every cow, every carriage, every acre of land in the state at a fixed sum. If the discrimination between "wholesale" and "retail" was by "a uniform rule of taxation," then a discrimination between producers, manufacturers, shippers, commission men and retail dealers would also be "a uniform rule." If the discrimination between "spirituous" and "fermented" liquors was by a "uniform rule of taxation," then a discrimination between the different species of every genus would be equally uniform. Upon that theory animals might be divided and subdivided. The same would be true with crops and produce. Lands might be divided into pine, oak, maple, prairie and swamp lands. Again, they might be divided into timbered, prairie, agricultural, horticultural and city or village lots. Such would seem to be the logical result of the observations of Judge COOLEY in the Michigan case last cited.

Section 7, item 12, of the amendment of the constitution of New Jersey, adopted in 1875, provided that "property shall be assessed for taxes under general laws and by uniform rules, according to its true value." Under that provision it was held that "the act of April 17, 1876, which provides that no mortgage or debt secured thereby shall be assessed for taxation, unless a deduction therefor is claimed by the owner of the land and allowed by the assessor, and that such mortgages or debts secured thereby as shall be subject to taxation shall be assessed for taxation in the township or city wherein the mortgaged premises are situate, *is constitutional.*" *State, Vail's Ex'rs, v. Runyon,* 41 N. J. Law, 98.

In discussing the question, DEPUE, J., said: "Independent of constitutional restrictions and prohibitions, the legislature

is the sole judge of the propriety of taxation. It may select and define the sources from which the public revenue shall be derived, and prescribe the means by which taxes shall be laid, levied and collected. Perfect equality in taxation is a good thing that is unattainable, and will be so long as the instruments of government are imperfect. The framers of the constitutional amendments did not aim at the impossible. . . . If property be such in its nature as, upon ordinary principles of taxation, to be capable of having a twofold *situs* for taxation, the legislature may select either as the place where the tax shall be laid. Chattels considered under the legal classification of personalty follow the person of the owner, and yet chattels may be so localized in use as to be taxable at the place where they are situate, as against the owner, who resides elsewhere within the state. A mortgage possesses the same dual characteristics. The debt of which the bond is the representative is a chose in action which has no locality, and will follow the residence of the owner. The mortgage, as security for the debt, is a conveyance of a qualified interest in the mortgaged premises, and creates an estate in lands. . . . The legislature may, I think, select as the *situs* of taxation of mortgages either the political division where the owner resides or that in which the mortgaged premises are situate. . . . The precise objection made by counsel to this law in this respect is, that it lacks the quality of uniformity, in that it does not subject all mortgages alike to taxation, but leaves the question whether the owner of a mortgage shall submit to taxation on it at the will or caprice of the mortgagor. If regard be had to the substance of the law, and not mere form, it is apparent that all mortgage interests are in effect made by this act liable to taxation. If the mortgagor chooses to pay that part of the tax which would be represented by the value of the interest of the mortgage, he may do so. In that event the mortgaged premises are valued without any abatement in valuation because of the mortgage debt. . . . This, I think, was the

whole legislative purpose of this act, and in this sense it cannot be regarded as a violation of the principle of uniformity in taxation established by this amendment. . . . The requirements of the constitutional provision relate to the essentials of a tax law which shall operate on citizens as tax payers *in invito*. They do not affect the contracts, engagements, or even the volition of individuals." Pages 104–7.

Prior to the new constitution of Pennsylvania, there was no restriction upon the legislative power on the subject of taxation.

In *Weister v. Hade*, 52 Pa. St., 474, it was held that "the power of the legislature to tax is without limit, and may be applied to all objects promotive of the general good, although remote and indirect."

In discussing the legislative power over taxation, Judge GIBSON said, in *Kirby v. Shaw*, 19 Pa. St., 260: "But it is a postulate of a state constitution, which distinguishes it from the federal, that all the power of the people is delegated by it, except such parts of it as are specifically reserved; and the whole of it is, without exception, vested in the constitutional dispensers of the people's money. As regards taxation, there is no limitation of it. Equality of contribution is not enjoined in the bill of rights, and probably because it was known to be impracticable."

In the *Commonwealth v. Hartman*, 17 Pa. St., 119, BLACK, C. J., said: "Congress can pass no laws but those which the constitution authorizes, either expressly or by clear implication; while the assembly has jurisdiction of all subjects on which its legislation is not prohibited."

In *Sharpless v. Philadelphia*, 21 Pa. St., 161, the same eminent judge applied the same rule to the subject of taxation, and said: "To me it is as plain that the general assembly may exercise all powers which are properly legislative, and which are not taken away by our own or by the federal constitution, as it is that the people have all the rights which are expressly reserved."

Section 1, art. IX of the new constitution of Pennsylvania, adopted in 1873, provided that "all taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws; but the general assembly may, by general laws, exempt" certain property named. Under this provision, in *Northampton Co. v. Lehigh Coal & Navigation Co.*, 75 Pa. St., 464, SHARSWOOD, J., said that "there is nothing in the provision . . . which at all contravenes the general principle settled by the supreme court, as to what is real estate within the classification of the tax laws, and that land necessary to the franchise of a railroad corporation is a part of such franchise, and not real estate subject to local taxation under the existing laws."

In *Kittanning Coal Co. v. Commonwealth*, 79 Pa. St., 100, it was held that "the act of April 24, 1874, taxing coal companies on their franchises, according to the amount of coal mined, *is constitutional*. Such taxation is not on the coal mined, but on the franchises, and is uniform. The constitution, in declaring that all taxes should be uniform upon the same class, etc., did not mean that the property should be separated from the owners, or that property, not owners, should pay the tax." AGNEW, C. J., giving the opinion of the court, said: "Clearly there is nothing in this [constitutional provision] prohibiting the power to classify. Will it be argued that persons or the owners of property cannot be classified? For example, can it be said that all single freemen cannot be required to pay a uniform tax? Or that the owners of horses or mules or of cattle cannot be taxed upon their horses, mules and cattle at a certain rate? Or that the owner of unseated lands, or of farms or mills, or houses and lots, cannot be taxed at a uniform rate? What difference is there between saying that all horses and mules shall be taxed a certain rate, and saying that the owners of these horses and mules shall be taxed at the same rate upon them? The distinction is evidently unmeaning. Persons pay

taxes, not property. This is so even when the remedy for the recovery of the tax is *in rem*. The law only takes hold of the property as a means of enforcing the duty of the person. When the constitution enjoins uniformity of taxation, it is because of the right of the citizen, not of a right possessed by his property. . . . Hence, when the constitution said that all taxes shall be uniform upon the same class of subjects within a given territory, it did not mean to separate the property from its owners, or that property and not persons should pay taxes. This would be simply absurd, for inanimate things cannot perform duties. Taxes are to be uniform, because of the right of the citizens to bear no more than equal burdens. . . . But without the power to classify men, as well as things, this undesirable inequality cannot be avoided; for if visible or tangible things only can be classified for taxation, then those whose wealth consists in that which is not visible or tangible, though it be far beyond the few visible effects of the poorer citizens, will not bear their proper share of the public burden. And among corporations or artificial persons the same result will take place. . . . But by classification this inequality between persons, natural or artificial, can be avoided. It is clear, therefore, that the moment we concede the power to classify, we have disposed of the question of uniformity, for then all that is required by the constitution is uniformity of taxes among the members of the class. . . . We must conclude, therefore, that a classification of coal mining and purchasing and selling companies is not beyond the legislative power, and the tax being clearly uniform upon their business, measured by the extent of it, is not only within the meaning of the constitution, but is just and equal." Pages 104-5.

It will be remembered that the provisions quoted from the several state constitutions have each contained one or more elements of restriction upon legislative power not present in our constitution. Bearing this in mind, and the peculiar

wording of the constitutional provisions which preceded ours, as well as those which have since been adopted, and in the light of the authorities cited, there would seem to be no possible room for doubting the soundness of the decision of this court in the *Milwaukee & Mississippi R. R. Co. v. Waukesha Co.*, upon all the points there involved, and, of course, disapproving whatever may be found in other opinions of this court in conflict with that decision. Our constitution contains no express provision in regard to exemptions from taxation. How far is the legislative power restrained upon that subject by implication? The only provision relied upon is the section already quoted: "The rule of taxation shall be uniform, and taxes shall be levied upon such property as the legislature shall prescribe." Of course, every exemption of property from taxation necessarily increases the burden of taxation on other property. It is urged with much force, therefore, that uniformity in the rule of taxation requires uniformity as to the *subjects* of taxation. But it is very manifest that no such uniformity has ever existed in the state, which indicates a very decided conviction the other way. The statute of 1849, ch. 15, sec. 4, which was adopted immediately after the constitution, in addition to exempting public property from taxation, also exempted — "(3) All personal property exempt by law from execution, not exceeding in value $200; (4) the personal property of all literary, benevolent, charitable and scientific institutions incorporated within this state, and such real estate belonging to such institutions as shall be actually occupied by them for the purposes for which they were incorporated; (5) all houses of public worship, and the lots on which they are situate, and the pews or slips and furniture therein, every parsonage, and all burial grounds, tombs and rights of burial; . . . (6) all public libraries, and the real and personal property belonging to or connected with the same; . . . (8) the personal property of persons who, by reason of infirmity, age and poverty, may, in the opinion

of the assessors, be unable to contribute towards the public charges." Similar provisions have been in force ever since.

It is manifest that much of the property which under that section would be exempt from taxation if owned by one man, would nevertheless be subject to taxation if owned by some other. If the uniform rule requires uniformity in the subjects of taxation, how could it ever be that the same horse or cow would be exempt when owned by A., but taxable the moment the same became the property of B.? Or, upon that theory, why should a house and lot, owned and occupied by a banker, cease to be liable for taxes merely because it became occupied by a minister as a parsonage? Such discrimination would not be traceable to any difference in the property, or subjects of taxation, but rather to the circumstances or business of the owner or occupant. It cannot be maintained that all property of a given class or kind shall be taxed by a uniform rule, while it is conceded that a portion of the same class or kind may be exempt. The very moment it is conceded, for instance, that chairs or bedsteads owned and used as furniture by one man are exempt, but that like articles so owned and used by another are subject to taxation, then we are compelled to admit that every kind, class or species of property may, in the discretion of the legislature, be divided up, and a part made subject to taxation, and the other part exempt from taxation. Of course, as urged by counsel, the section has no significance except as a limitation upon legislative power. But this does not mean that every clause and every word on a given subject, found in the constitution, is of itself a limitation. It only means that such constitutional provision on a given subject, *taken as a whole*, is a limitation. As was well stated by BLACK, C. J., in *Sharpless v. Philadelphia*, 21 Pa. St., 161: "The reservation of some powers does not imply a restriction on the exercise of others which are not reserved. On the contrary, it is a universal rule of construction, founded in the clearest reason, that *general words* in any instrument

or statute *are strengthened by exceptions and weakened by enumeration.*"

The section in question is composed of two clauses. Does the one modify the other? If so, which is modified, and which is the modifier? Or do they modify and control each other? It is significant that the last clause was first agreed upon in the convention. The provision on the subject was first introduced to the convention in this form: "Sec. 1. All taxes levied in this state shall be *as nearly equal as may be.* Sec. 2. The property of the state and counties, both real and personal, and such property as the legislature shall deem proper, belonging to educational, charitable or religious institutions, or set apart for such purposes, shall be exempted from taxation." In considering the second section, Delegate Lovell said: "Such were the established rules of construction with reference to constitutional provisions, that if the convention made certain exemptions it would operate as a prohibition upon the legislature to make any other or further exemptions. If, therefore, the proposed section should be adopted, it would make an end of all legislation on that subject. The legislature would have no power to exempt any other property from taxation, whatever might be the necessity for and propriety of such exemption." Had that section 2 been adopted, it would have operated as an exception to the first section, and, according to Judge BLACK, would have made the section more stringent. But it was finally stricken out.

Thus it was clearly the design of the convention to leave the legislative power entirely unrestricted on the subject of exemptions, unless it arises by implication from the language of the section finally adopted. And then to the proposition to adopt the words, "all taxes levied in this state shall be as nearly equal as may be," Judge WHITON proposed to add, and the convention, with a slight change, adopted this: "and shall be levied upon such property as the legislature shall prescribe." Thereupon Judge WHITON proposed to strike out the section

as proposed, and substitute therefor what was, in substance, adopted, that "the rule of taxation shall be uniform throughout this state." Manifestly the two clauses thus adopted were intended to modify each other. The second clause enumerates certain powers that may be exercised notwithstanding the first, and hence materially weakens it. If we put the substance of the two together in the order in which they were adopted, we may, perhaps, get a clearer idea of the real meaning of the framers, and we would then have: "*Taxes shall be levied upon such property as the legislature shall prescribe*" by "*a uniform rule.*" Or, without transposing the clauses, if we leave out superfluous words, we have: "The rule of taxation shall be uniform . . . upon such property as the legislature shall prescribe." Since the legislature are to "prescribe" the "property" which must bear the burden of taxation, it follows, as a logical sequence, that the balance of the property in the state, and which is not so "prescribed," must necessarily be exempt from taxation. It is only upon the property so prescribed or designated by the legislature that the rule of uniformity can have any application. It clearly cannot apply to property not prescribed, and which would therefore be exempt. But the right of the legislature to prescribe what property shall be taxed, includes the right to prescribe what shall not be taxed. The right of choosing some from the multiplicity of kinds, classes, species, use and ownership of property in the state, and the rejection of others, includes the absolute power to discriminate between what shall be chosen and what rejected, except in so far as it may be limited by the requirement of a uniform rule. But what is to be the standard of the rule? The constitution simply defines it as "the rule of taxation."

As stated in one of the cases cited, this provision of the constitution does not execute itself. It does not say that "*all lands,*" etc., "shall be taxed equally and uniformly," as in Tennessee, nor that "all property shall be taxed according to *its*

*value,*" as required in the same state. It does not say that the "mode". "shall be by valuation," and the "tax in proportion to value," as in Illinois and Missouri. It does not require equality of apportionment and assessment, according to a just valuation, as in Maine. It does not say that "taxation shall be equal," and assessed on property "in proportion to its value," as in Louisiana. It does not forbid "privileges or immunities" to some citizens in preference to others, as in Iowa. It does not name the property to which it shall be applied, as in Ohio; nor declare, in addition, that such property so named shall be taxed at "its true value in money," as is also required in Ohio. It does not require "a uniform and equal *rate* of assessment and taxation," as in Kansas and Indiana. It does not require, in addition to a uniform rule, that "all assessments . . . shall be on property *at its cash value,*" as in Michigan; or, "its true value," as in New Jersey. It does not require that "all *taxes* shall be uniform upon the same class of *subjects,*" as in Pennsylvania. It simply requires that "the rule of taxation shall be uniform." But who makes the rule which is thus to be uniform? Was it made by the constitutional convention, or was it left for the legislature? Most of the constitutions referred to, where the word "uniform" has been used, have directly or indirectly applied it to property named therein, or valuation, or rate, or taxes, or classes of subjects; but in our constitution it applies to none of those things, but simply to the "*rule* of taxation." What is this rule of taxation? Manifestly, it is the act of levying a tax, or imposing taxes, on the subjects of the state by the legislative power of the state. It is the measure of individual duty in support of the public burdens, and the means of enforcing the same. The rule of taxation is the law of taxation. Such rule or law must be prescribed by the legislature, as well as the property to which it is to be made applicable. But the uniformity does not go directly to the property so prescribed, but only to the "rule" or law by which contributions are en-

forced against the owners of such property. The uniformity reaches the property so designated by the legislature, but *only* through the "*rule*" or law prescribed. As the uniformity could through the rule or law only reach such property as the legislature should designate as being subject to taxation, it is very evident that it never could reach property not so designated, and therefore exempt from taxation, and hence to which the rule could not apply. The legislature has the exclusive power to designate the property which shall be subject to taxation, and to prescribe a rule or law by which the owners of such property are forced to contribute to the public burdens, limited only by the requirement that the *rule* so prescribed shall be uniform. Uniformity of rule is entirely different from uniformity of subjects to which the rule is applicable. Most general laws are uniform rules, but the diversities in the subjects to which they apply are innumerable.    In determining just what the rule of uniformity shall be in taxation, and how it shall be applied, there is a wide field for legislative discretion.    Of course, it could be applied to rate or valuation, or mode or manner of assessment or collection, or all exemptions might be repealed or greatly modified; and so it could be applied to all property, or to certain subjects, or to certain classes, kinds or species of property.    The denial of the power of the legislature to determine and fix "the rule of taxation," subject to the limitation of uniformity, and the attempt to engraft it upon the constitution itself, as had been done by apt words in other constitutions, has led to much diversity of opinion, if not confusion of terms.

In 1866, and while the state was holding the lands described in trust for the purpose of building the proposed line of road now owned by the plaintiff, and hence, while they were not subject to taxation, the legislature conferred upon the corporation the right to earn the lands, and, in furtherance of that object and the execution of the trust, exempted the same from taxation for the term of ten years, and then extended such

exemption, by the act complained of, for the term of three years. For the reasons given, we are of the opinion that such exemption and extension were authorized by the constitution. We therefore conclude that — (1) No tax can be imposed upon lands while they remain the property of the United States. (2) No tax can be imposed upon lands granted by the United States to the state in trust for works of internal improvement, and as to which the trust has not been executed. (3) But as fast as such lands have been earned by the railroad company under such grants, and the state and United States have each parted with all right, title and interest therein to the company by patents regularly issued, the same become relieved, *pro tanto*, of the trust implied in the grant, and subject to the legislative will in the imposition of taxes. (4) The state legislature may exercise any and all legislative power not delegated to the general government, nor restricted nor reserved to the people by the state or national constitution. (5) A constitutional provision subject to construction should be construed in the light of the circumstances and discussions which led to its adoption, and similar provisions existing in other state constitutions at the time, as well as subsequent adjudications upon the meaning of the words employed. (6) Construing section 1, art. VIII of our constitution in that way, the decision of this court in the case of *M. & M. R. R. Co. v. Board of Sup'rs of Waukesha Co.*, 9 Wis., 449, appears to be eminently sound upon all the points involved, and all contained in subsequent opinions inconsistent therewith is hereby disapproved. (7) Accordingly, taxes can only be levied upon such property as the legislature shall prescribe, and then only by a uniform rule, but it is the "rule," and not the property, which the constitution thus requires to be "uniform." (8) The legislature not only has power to prescribe the property to be taxed, but the rule by which it must be taxed; and the only limitation upon that power is that the rule so prescribed shall be uniform., (9) The power to pre-

scribe what property shall be taxed necessarily implies the power to prescribe what property shall be exempt. (10) While the lands described were held in trust for the building of the proposed line of road now owned by the plaintiff, and hence not subject to taxation, the legislature had the power, in furtherance of that object and in execution of the trust, to exempt the same from taxation for a term of years; and such power, having been exercised, could, within the discretion of the legislature, be renewed by granting an extension.

The judgment of the circuit court must be affirmed.

ORTON, J.   I concur in the opinion that this class of property is liable to taxation.   But I respectfully dissent from the opinion that any particular part of this class of property, and not the whole class, may be exempted from taxation, in the discretion of the legislature.   Such a concession of legislative power in this case will allow it to be exercised in any case for the most odious and unjust inequality, discrimination, partiality and favoritism, for any reason whatever, personal or otherwise, restrained only by legislative discretion. If to tax a part of a certain class or kind of property at a less rate than the remainder violates the constitutional rule of uniformity, much more to entirely exempt such part from any tax whatever.   All of the property of any particular owner, or of all owners except one or a few, and all property in any particular county, or in all counties except one or a few, or all of the property in the state less than the whole, may be exempted from taxation, irrespective of class or kind, under such a construction of the rule.   It seems to me that these are the very evils — because the greatest — which were intended to be prevented by the constitutional rule of uniformity.   If the legislative discretion is to be trusted with such a power for evil, why was it restrained at all, or merely to prevent far less evils?   The simple and untortured language of the constitution, in my opinion, requires taxation to be according to a

"uniform rule," *in its broadest sense*, and if a certain class of property is made taxable at all, it must not only be taxed at a uniform rate, but *all of it* must be taxed without partiality or discrimination, and at such rate. I cannot but think that this is the body, spirit and intent of the provision. The debates of the convention, and the earliest legislative construction, indicate most clearly that exemptions could be made only of certain classes of property, such as property devoted to religious, charitable or other similar purposes, and not of parts and parcels of any class, less than the whole. This would not infringe the rule of uniformity.

Any other construction of the provision would emasculate it of all of its force and effect, and as a restriction upon the legislative power it was not worthy of adoption, and is not worth preserving. To so construe it as to allow the legislature to exempt all property except that owned by one person, and tax that alone, and then to require, as the sole purpose of the provision, that that person's property should be taxed. according to the rule of uniformity, would be ludicrous, if it were not so outrageously pernicious. In charity to the convention which adopted it, such a construction ought to be put upon it as not to stultify that body, and make worthless and futile a provision wisely designed to equalize by a uniform rule the heavy burdens of taxation upon the people of the state. The construction which allows only of class exemption is so easy, just, natural and reasonable, that I would not try very hard to find any other.

*By the Court.*— Judgment affirmed.